Per Curiam;
This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the *180 order of reference and Eule 134(h). The commissioner has done so in an opinion and report filed on December 10,1971. Defendant timely filed a notice of intention to except to the commissioner’s report which, defendant subsequently withdrew. Both parties have now (by plaintiff’s motion of February 24, 1972, and supplemental motion of March. 3, 1972, and defendant’s response of February 28, 1972) stated their request or consent that the court adopt the trial commissioner’s opinion as the 'basis for its judgment in this case.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it 'hereby grants plaintiff’s motion (as supplemented) for judgment and adopts the opinion, findings of fact and recommended conclusion of law as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $16,780.
OPINION OP COMMISSIONER
Day, Commissioner: This is a contract case in which only the amount of damages is in issue, the government having admitted that it wrongfully terminated a contract made with the plaintiff. Since the pertinent facts are fully stated in the attached findings, it is enough to say here that the government’s action was based on its mistaken belief that plaintiff had defaulted by not furnishing a proper performance bond within the allowed time period. In fact, however, the termination was premature, coming before the period expired, and plaintiff eventually furnished a timely and proper bond. Both parties now agree that plaintiff was not in default.
The contract did not contain a clause allowing termination for the convenience of the government and none was required to be inserted under any applicable federal regulation. [Transcript at 6.] See G. L. Christian & Assoc. v. United States, 160 Ct. Cl. 1, 312 F. 2d 418 (1963), cert. denied 375 U.S. 954 (1963). There was only one reference to a convenience termination (see finding 3), and it was limited to *181 cases in which the contractor’s default might be excusable due to causes beyond his control. Consequently, the termination constituted a common law breach of contract. See Nolan Bros. v. United States, 186 Ct. Cl. 602, 609, 405 F. 2d 1250, 1254 (1969), in which this court said:
* * * In John Reiner & Co. v. United States [citation omitted], the Government canceled the contract outright (without any payment at all) because the General Accounting Office had said the award was improper; we held the award legal and the cancellation baseless but that the termination-clause measure-of-recovery applied ; if that article were absent or inapplicable, the defendant's action would have been treated exactly as a common law breach. * * * [Emphasis added.]
Accordingly, plaintiff’s recovery is to be measured by its anticipated profits from the contract. Cf. David J. Joseph Co. v. United States, 113 Ct. Cl. 3, 82 F. Supp. 345 (1949); Brown & Son Electric Co. v. United States, 163 Ct. Cl. 465, 325 F. 2d 446 (1963); Albano Cleaners, Inc. v. United States, 197 Ct. Cl. 450, 455 F. 2d 556 (1972).
Prior to trial, defendant asserted that no recovery should be allowed because plaintiff was not ready, willing and able to perform the contract on May 22, 1967, citing United States v. Penn Fowndry & Mfg. Co., 337 U.S. 198 (1949). Now, however, the government admits, and I have so found, that plaintiff would have been ready on time but for the government’s breach. Therefore, the only remaining task is to determine the amount of plaintiff’s anticipated profit.
In this regard, I have considered (1) plaintiff’s actual expenditures for 1969, the first year in which its books attributed expenses to individual aircraft, (2) the estimated costs of operating plaintiff’s business in 1967, (3) the performances of plaintiff’s competitors who had similar contracts with the Bureau of Land Management in 1967, and (4) the testimony of both parties’ expert witnesses. Based on these factors and the evidence presented, I have concluded that plaintiff’s reasonably anticipated profit on the terminated contract would have been $16,780.
*182 FINDINGS op Fact
1. Plaintiff, North Star Aviation Corporation, is and was at all times relevant hereto, a corporation organized under the laws of the State of Alaska, with its principal office in Fairbanks, Alaska. It was organized in 1966 by Eobert Schact and William Witmer for the purpose of obtaining and performing contracts with the Bureau of Land Management of the Department of the Interior to provide fire fighting services in Alaska.
2. Pursuant to an invitation to negotiate, plaintiff entered hito contract No. 14-11-0001-3555 (Neg.) with the Bureau of Land Management (BLM) to provide a tanker aircraft and pilot to be used for dropping fire retardants on forest and range fires in Alaska, from May 22 through August 19, 1967. Plaintiff was notified that this contract was accepted on December 9,1966.
3. The only provisions of the contract dealing with termination were contained in Article XX (Default and Termination), as follows:
ARTICLE XX. DEFAULT AND TERMINATION :
(a) The Government may, subject to the provision of Paragraph (c) below, by written notice of default to the contractor, terminate the whole or any part of this contract in any one of the following circumstances:
(1) If the contractor fails to perform the provisions of this contract within the time specified, or
(2) If the contractor fails to perform any of the provisions of this contract in accordance with its specifications, terms, and conditions, and does not cure such failure within the time specified by the Contracting Officer by written notice specifying such failure.
(b) In the event the Government terminates this contract in whole or in part as provided in (a) above, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, services, or any other requirements of the contract, similar to those terminated, and may take possession of and utilize in completing the work such materials, appliances and plant as may be on the site of the work and necessary therefor, and the contractor shall be liable to the Government for excess costs and any other damages *183 occasioned by the default of the contractor. If the Government does not terminate the contractor’s right to proceed, he shall continue the work and shall be liable to the Government for any actual damages occasioned by his failure to perform except to the extent that liquidated damages are stipulated in lieu thereof.
(c) The contract shall not be terminated nor the contractor charged with excess costs or other damages under (b) above if the failure or delay in completion of the work is due to causes beyond his control and without his fault or negligence, or delays of subcontractors or suppliers due to causes beyond their control and without their fault or negligence.
(d) If, after notice of termination of this contract under (a) above, it is determined that the failure to perform this contract is due to causes pursuant to (c) above, such notice of default shall be deemed to have been a termination for convenience of the Government, the contract shall be equitably adjusted to compensate for such termination and the contract modified accordingly ; failure to agree to any such adjustment shall be a dispute concerning a question of fact to be decided pursuant to Clause 12 on Standard Form 32.
4. Article XVII of the contract required plaintiff to furnish a performance bond within 15 days of its formation on December 9,1986. In January 1967, after a demand for immediate compliance, plaintiff submitted a bond which was rejected on January 24 because it was improperly executed. Although the 15 days had elapsed, the BLM extended the deadline to February 15, 1967. Plaintiff’s second bond was submitted on January 31 and was also rejected for improper execution on February 3. This time, however, the BLM terminated the contract for the convenience of the government. On February 13, within the new deadline, plaintiff furnished a satisfactory bond as required, but a replacement contract had already been negotiated with a third party.
Plaintiff did not enter into any other contracts with the BLM in 1967. In both 1968 and 1969, however, plaintiff entered into contracts with the BLM to perform fire fighting services, which contracts were similar to the contract in suit.
5. Plaintiff protested the termination to the Comptroller General, who decided that a valid contract had been entered *184 into and that plaintiff had not defaulted, since it furnished the bond within the extended time period. However, no action was taken because the contract had been relet to another party. 47 Comp. Gen. 1 (1967).
6. Later, plaintiff requested and was issued a final decision by the BLM contracting officer, which denied its claim for damages based on wrongful termination of the contract. On October 28, 1968, plaintiff made a timely appeal to the Department of the Interior Board of Contract Appeals. Both plaintiff and the government agreed that there had been a wrongful termination by the government, but the latter asserted that there could not be any recovery because plaintiff was never able to perform the contract. Because there was agreement that the government had breached the contract, the Board of Contract Appeals dismissed the appeal for lack of jurisdiction.
7. In this present action, the government admits that plaintiff would have been ready, willing and able to perform the contract by May 22, 1967, if it had not been terminated by the government.
8. In December (after the contract was made), plaintiff bought a used B-25 aircraft and arranged with Air West Sales & Service of Seattle, Washington, to modify the aircraft to meet the contract requirements. This involved installing a 1,000-gallon tank in the bomb bay and getting airworthiness certifications from the Federal Aviation Administration (FAA) for both the plane and the tank. All these arrangements were handled by plaintiff’s president, Eobert Schact.
Work on the plane continued until early March 1967, when a BLM representative visited the site and informed Air West that plaintiff’s contract had been terminated. By that time, the plane itself was serviced and ready for FAA inspection, but the tank had yet to be installed. At the suggestion of the BLM representative, Air West decided to stop further work on the plane. If work had not been halted, plaintiff would have been ready to perform the contract on May 22, 1967.
In July 1967, Schact visited Air West, hired local labor, and personally resumed the installation of the tank. The work was completed and the aircraft and tank were certified airworthy on August 9,1967.
*185 9. Article XII of the contract (Contract Costs) set out the two scales by which plaintiff was to be paid — (1) availability pay (or standby pay) at $200 per day for the 90-day period, and (2) flight pay at $350 per hour flown up to 30 hours, and $130 per hour thereafter. However, Article VIII (Unavailability of Tankers or Personnel) provided that the maximum availability pay of $18,000 could be reduced. It stated, in part, as follows:
Failure to perform the services required by this contract will cause serious damage to the Government Because of difficulty, if not impossible [sic], to determine exact damage, fixed and liquidated damages equal to daily availability costs will be assessed for each calendar day or portion thereof each aircraft or crew not available to perform services described in this contract.
10. There were five other contractors who had agreements with the BLM similar to plaintiff’s in 1967. Evidence presented during the trial showed that their actual performance of their contracts and rates of pay were as follows:[1]

11.Using the median of the other five contractors’ performances as a fair measure of plaintiff’s performance and the rate of pay provided in plaintiff’s contract, the anticipated revenue from the contract in suit is as follows:
Availability Pay:
83 days at $200 per day- $16, 600
Plight Pay:
30: 00 hours at $350 per hour_ 10, 500
42: 07 hours at $130 per hour_ 5, 475
Plaintiff’s anticipated revenue_$32, 575
*186 12. In determining the pilot expense and other direct expenses plaintiff would have incurred in performing the BLM contract, the actual expenses from 1969 were considered (the first year in which plaintiff’s books and records allocated direct expenses to its various aircraft).
13. In 1969, plaintiff paid a total of $85,917 for pilots to fly all its planes, of which $31,019 was paid to its B-25 pilots. Of the income produced by the B-25, 81.5 percent was attributable to a BLM contract in that year. Since pilot expense and contract income were both determined on the basis of monthly standby rates and hourly service rates, the B-25 pilot expense may be allocated to the BLM contract in the same proportion as the B-25 income. This results in a pilot expense of $25,280 on the 1969 BLM contract.
14. During this period, the rate for flying time was $50 per hour. On this basis, plaintiff paid $15,892 in 1969 flight pay, leaving standby pay of $9,388.
The 1967 standby period (83 days) was three-fourths of the 1969 standby period (112 days). Therefore, plaintiff would have paid three-fourths of $9,388 — or $7,041 — as standby pay under the 1967 contract.
15. Using the median contractor in 1967 (finding 10) as a measure of plaintiff’s performance, it would have paid for 72:07 pilot hours. At $50 per hour, the cost would have been $3,606.
16. The total pilot costs in 1967 would have been:
Pilot standby pay- $7, 041
Pilot flight pay- 3, 606
Total-$10, 647
17. Plaintiff’s 1969 expenses were also used to determine its remaining direct expenses in 1967. Included in this consideration were the costs of B-25 fuel, repairs, parts, landing fees, and salaries for other crew members and mechanics al-locable to the 1969 BLM contract. On this basis, plaintiff’s direct expenses, in addition to pilots, would have been $3,468.
18. Lastly, in performing the terminated contract, some of plaintiff’s indirect expenses would have been increased *187 above their 1967 levels. The total increase in overhead would have been $1,680.
19. In summary, plaintiff’s expenses and profit in 1967 would have been as follows:

CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover damages in the amount of $16,780.

 A second contract of one of the contractors was excluded because the plane used therein crashed in midseason.