CALFON CONSTRUCTION, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 792–87C.

United States Claims Court.

June 6, 1989.

Paul M. Mahoney, Pomona, Cal., for plaintiff.

Tamra Phipps, Washington, D.C., with whom was Asst. Atty. Gen., John R. Bolton, for defendant.

## ORDER

NETTESHEIM, Judge.

This case is before the court on defendant's motion for summary judgment emanating from a motion to dismiss for failure to state a claim upon which relief can be granted. Plaintiff has opposed and argument has been held. At argument the court ruled that defendant's motion should proceed under RUSCC 56. Defendant supplied its statement of uncontested material facts and renewed its summary judgment motion on additional grounds. Plaintiff once again has opposed. Further argument is deemed unnecessary.

## FACTS

The record is rife with disputed issues of material fact. However, because one salutary purpose of summary judgment is to narrow issues for trial, see RUSCC 56(e), the court welcomes the opportunity to separate at least some wheat from the chaff. Except as noted, the following facts are undisputed. On September 30, 1983, Calfon Construction, Inc. ("plaintiff"), was awarded fixed-price contract No. N62474–83–C–2349 calling for concrete paving of the Hangar 300 aircraft apron located at the Naval Air Station in Fallon, Nevada ("Fallon"). The Invitation for Bids issued on August 19, 1983, contained the following Description of Work:

> The work includes the furnishing of all labor, materials and equipment for demolition and removal, earthwork, storm drainage system, portland cement stabilized base course, asphalt concrete pavement, portland cement concrete pavement, cast-in-place concrete, joints, reinforcement and mooring eyes in concrete pavements, resealing in rigid pavements, pavement markings, concrete repairs, metal work, air start compressed air system, underground electrical work, airfield lighting, cathodic protection and incidental related work.

The contract price was $2,599,280. According to plaintiff's President Vincent DeBellis, the scope of the work consisted of the following:

> First, cut trenches in the existing portland cement concrete (PCC) aircraft parking apron and install underground air lines, electrical ducts, manholes, catch basins, drain lines, and aircraft service console risers. Second, backfill to the level of existing concrete apron surface. Third, overlay the entire old concrete apron, including areas of trenching, with a one inch asphalt concrete (A.C.) bond breaker. Fourth, place an eight inch PCC overlay on top of the A.C. bond breaker over the entire apron. Fifth, install miscellaneous taxi-weight throats, shoulders, lighting and stripping....

Declaration of Vincent DeBellis, Feb. 14, 1989, ¶ 3. The contract drawings reflected a grading plan, finished elevations, and the typical overlay for the Hangar 300 apron. Drawing C–4 contained the finished elevation and contour grades to be met by the contract. Drawing C–13 depicted a typical finished concrete section showing an eight-inch PCC overlay.

Plaintiff proceeded to perform the contract in conformance with the contract specifications. A one-inch A.C. bond breaker was installed over the entire apron in conformance with the plans and specifications. Subsequent to the installation of the A.C. bond breaker and prior to commencing work on the PCC overlay, rain ensued. Plaintiff discovered that puddling had developed on the one-inch A.C. bond breaker. Plaintiff viewed the puddling as excessive and unsatisfactory. If plaintiff poured the PCC overlay to conform to the A.C. bond breaker, the same pattern of puddling would occur on the finished surface.

The General Provisions of the contract included paragraph 62(a), the contractor's "Warranty of Construction:"

> In addition to any other warranties set out elsewhere in this contract, the Contractor warrants that work performed under this contract conforms to the contract requirements and is free of any defect of equipment, material or design furnished, or workmanship performed by the Contractor or any of his subcontractors or suppliers at any tier. Such warranty shall continue for a period of one

year from the date of final acceptance of the work, but with respect to any part of the work which the Government takes possession of prior to final acceptance, such warranty shall continue for a period of one year from the date the Government takes possession. Under this warranty, the Contractor shall remedy at his own expense any such failure to conform or any such defect....

Paragraph 62(f) identifies the situation where the defect is not the fault of the contractor or subcontractor:

Notwithstanding any other provision of this clause, unless such a defect is caused by the negligence of the Contractor or his subcontractors or suppliers at any tier, the Contractor shall not be liable for the repair of any defects of material or *design furnished by the Government,* nor for the repair of any damage which results from any such defect in Government furnished material or design.

(Emphasis added.)

Prior to commencing work on the concrete overlay, plaintiff commissioned an independent survey by the firm of Thompson & Hysell. The survey concluded that in order to meet the contours specified in Drawing C–4, different areas would require differing amounts of concrete. Drawing C–4 required paving to the contours, while Drawing C–13 required a uniform eight-inch thickness over the entire PCC overlay. Drawing C–4 shows a variation in contour elevations from 33.0 to 36.5 degrees. In order to create drainage lines, the elevations fluctuated from increases in elevation followed by decreases. Drawing C–13 shows typical details of the contractor's work requirements. The details call for a uniform eight-inch PCC overlay.

According to Lt. Steven J. Markey, the Navy's Assistant Resident Officer in Charge of Construction at Fallon, sometime after the contract starting date of July 1, 1985, Mr. DeBellis, along with Harold Lien, plaintiff's Project Superintendent, and Murray Morin, the Quality Control Representative on the contract, informed the office of the Resident Officer in Charge of Construction (the "ROICC") that there was a discrepancy in the contract drawings. Declaration of Lt. S.J. Markey, May 23, 1988, ¶ 4. Mr. Morin asserts that he, not a representative of plaintiff, first alerted Lt. Markey to the problem, which he said was not apparent from the contract plans and specifications and characterized as variations in the elevations. Declaration of Murray Morin, May 30, 1989, ¶¶ 2–3. Mr. Lien informed Lt. Markey that in order to perform the concrete work to the finished contours, additional concrete would be required, which would increase the cost of performance. Markey Declr. ¶ 4. Lt. Markey and, by deposition, Roy B. Smith, a Navy civil engineer working for the ROICC, take the position that Mr. Lien said to Mr. Smith that plaintiff had bid the job on the basis of paving to the contours. Markey Declr. ¶ 6. Mr. Lien denies having made the statement. Declaration of Harold Lien, May 23, 1989, ¶ 4. The Daily Report of September 26, 1984, proffered by defendant, is not consistent with an admission by Mr. Lien as to how plaintiff bid the contract. The remarks attributed to Mr. Lien merely disclose that "Brutoco [Brutoco Engineering & Construction, Inc., plaintiff's subcontractor] was planning to pave apron to contours."

On September 25, 1985, Lt. Markey orally informed plaintiff that a concrete overlay of eight inches as shown in Drawing C–13 would be acceptable. Markey Declr. ¶ 5. According to Lt. Markey's deposition, because contract funds were tight, the Navy simply wanted to go with the eight-inch overlay. Lt. Markey in deposition testified that he did not intend to hold plaintiff responsible for any puddling resulting from proper installation of the eight-inch overlay and so told Mr. Lien and perhaps Mr. DeBellis.

The oral authorization was followed up on September 27, 1985, by Lt. Markey's letter, which acknowledged Mr. Lien's assertion that there was a discrepancy between Drawings C–4 and C–13, further stating:

For clarification, either paving to meet the contours shown in the plans or pav-

ing to achieve an 8″ PCC overlay will meet the Contract requirements. Calfon has the option to choose which method they will utilize at no change in the contract cost or time.

Lt. Markey's September 27 letter also reflected that Mr. Lien had contacted Mr. Smith, stating that plaintiff's bid called for paving to the contours shown on Drawing C–4 and that plaintiff intended to proceed based upon its bid. According to Lt. Markey's letter, Mr. Smith had informed Mr. Lien that paving to the contours would be acceptable.

On September 30, 1985, Lt. Markey sent plaintiff a topographic grid. The cover letter specified that inclusion of the grid was at plaintiff's request. The letter also stated that "thickness problems will be identified to this office prior to the placement of the PCC pavement so corrections can be made." The letter advised that the grid was not part of the original contract; that the contractor was responsible for verifying elevations; and that the use of the grids should not result in any additional costs, delays, or claims to the Navy. On the same date, plaintiff began laying out the grid for its final paving.

Lt. Markey asserts that plaintiff made no further inquiry into the September 27, 1985 letter and sought no further clarification of the option offered in that letter. Second Declaration of Lt. S.J. Markey, Apr. 17, 1989, ¶ 3. According to Lt. Markey, plaintiff did not register any protest prior to performance of the work or challenge the option as illusory. Nor did plaintiff request a waiver of the contractor's warranty contained in General Provision 62, or any other sort of statement or assurance limiting plaintiff's responsibility for the results of placing an eight-inch overlay beyond that contained in the September 27, 1985 letter. Second Markey Declr. ¶ 4. Lt. Markey states that plaintiff did not submit to him any notice that it regarded the September 27, 1989 letter, or any other directive that was issued during administration of the contract, as a change order which required paving to the contours pursuant to Drawing C–4. Second Markey Declr. ¶ 5.

Plaintiff takes pointed exception to Lt. Markey's recollection. Mr. DeBellis discusses a meeting with Lt. Markey before the September 27, 1985 letter:

At that meeting, I advised Lt. Markey that there was a discrepancy in the contract drawings. I told Lt. Markey that if CALFON paved the parking apron to an eight-inch thickness, the parking apron would not drain properly and puddling would occur. Lt. Markey stated that the parking apron would have to drain properly in order for the Navy to accept it. I specifically asked Lt. Markey that if CALFON paved to the eight-inch thickness, would the Navy relieve CALFON of the responsibility of repairing it if puddling occurred. Lt. Markey told me that he was not authorized to relieve CALFON of any responsibility if puddling occurred.

I then protested to Lt. Markey that it was not feasible for CALFON to pave to the eight inches if the Navy was going to hold CALFON responsible for the puddling which was certain to occur. I protested that CALFON had no choice except to pave to the contours.

I again asked Lt. Markey what assurance would CALFON have that CALFON would not be held responsible if it paved to the eight-inch thickness and if puddling occurred just the way it had occurred on the one-inch ac [A.C.] bond breaker. Lt. Markey said that he could not assure me that if CALFON paved to the eight-inches, the Navy would not hold CALFON responsible if puddling occurred.

Because Lt. Markey told me that the parking apron would have to drain properly in order for the Navy to accept it and that he was not authorized to relieve CALFON of responsibility if CALFON paved to the eight-inch thickness, CALFON had no choice except to pave to the contours. At the meeting, we discussed the fact that CALFON would pave the parking apron to the contours so that it would drain properly. CALFON agreed that it would "stab the grade" (i.e., measure the thickness at various points) to determine if there were plusses or minus-

es (overages or underages) of concrete. This information would be provided to the Navy so that there would be no surprises to anyone as to how much concrete would be poured when it came time to make adjustments. Lt. Markey specifically agreed to this procedure.

Second Declaration of Vincent DeBellis, May 24, 1989, ¶¶ 11–14.

On October 17, 1985, plaintiff's subcontractor, Brutoco Engineering & Construction, Inc. ("Brutoco"), began paving the PCC overlay in accordance with Drawing C–4. By letter of November 5, 1985, Verner E. Thomas, Brutoco's Project Manager, contacted plaintiff regarding the necessity of using additional concrete to pave to the contours in conformity with the grade stakes that plaintiff had put down. Brutoco's letter contained the following: "A review of actual Grade Stakes versus the indicated Paving Section shown on page C–13 of the Contract Plan, indicates an increase in the quantity of concrete area computation shows a 1400 cubic yard increase in the concrete paving." Brutoco requested issuance of a change order in the amount of $53,900 for the additional work.

On November 13, 1985, plaintiff submitted a copy of the November 5, 1985 Brutoco letter identifying an overrun of 1,400 cubic yards. Plaintiff also requested the issuance of a change order. Lt. Markey responded on December 2, 1985, referring plaintiff to his September 27, 1985 letter, which identified plaintiff's option of either paving to contours or providing an eight-inch PCC overlay. Since plaintiff elected to pave to the contours and controlled the survey of the guide wire elevations and the finished grade, as well as placing the guide wires, Lt. Markey was of the view that no adjustment to the price or time of performance was justified. On December 5, 1985, paving of the apron area was completed. The remainder of the paving of the taxiways and fill-in areas was completed on January 7, 1986. Plaintiff's work was accepted. There were no drainage problems.

On January 27, 1987, plaintiff submitted an estimate for a change order and, in the alternative, a claim in the amount of $95,982.96 for the extra work performed by Brutoco and a 12–day time extension. The claim figure represented costs to plaintiff of $40,739.91, costs to Brutoco of $46,584.21, additional costs for plaintiff's overhead of $2,329.21, and a profit of $5,379.20. A bond premium charge of $950.33 also was included.

Lt. Markey responded on March 9, 1987, in a letter stating that his office "does not consider the quantity of concrete actually placed to be the issue. If additional concrete was placed ..., it was due to decisions by the contractor and not government direction...."

On April 3, 1987, the final decision of the contracting officer was sent to plaintiff. The decision chronicled the events leading up to the request for additional compensation and time. Specifically, the decision identifies Lt. Markey's position regarding what constituted acceptable performance:

Resident Officer in Charge of Construction ("ROICC") letter serial 2349/091 of 27 September 1985 addressed a telephone conversation with your Superintendent in July 1985 relating to the variance in concrete quantities to be placed in complying with contours shown on Sheet C–4 rather than the 8″ shown on Sheet C–13, and your additional costs incurred. The letter also noted that on 25 September 1985 your Superintendent was informed that the 8″ overlay would be acceptable, and on 26 September 1985 your Superintendent stated your bid was based on meeting finish contours and paving would be done in this manner. The letter stated that either method would meet contract requirements, and you had the option to choose either at no change in contract cost or time.

The decision letter further states that plaintiff's method of paving was optional, even though plaintiff believed that it was required by its bid to pave to the contours. The contracting officer's conclusion reads, as follows:

The claim documentation shows that upon your request for clarification on the thickness of concrete sections, the

ROICC advised you that you had an option to pave to the contours shown on Sheet C–4, or place an 8″ overlay as shown in the typical section on Sheet C–13. The ROICC states in such documentation that your Superintendent advised him you had bid to meet the finish contours and you would pave in this manner.

After plaintiff commenced suit, most of the witnesses familiar with this contract were deposed. Patrick M. Callahan was employed by the Navy as a Construction Representative. His job was to monitor the progress of work on a daily basis to ensure that the contractor was conforming with plans and specifications. Mr. Callahan stated in deposition that after the bond breaker was put down and it rained, there was puddling on the apron, which he described as being six to eight puddles about the size of a table. Mr. Callahan was concerned that the puddling would continue on the PCC overlay if the work followed the "same base" as the bond breaker. Mr. Callahan testified that representatives of the Navy, namely Lt. Markey; Lt. Commander James R. Applegate, Deputy ROICC at Fallon; and representatives of the Western Division, Naval Facilities Engineering Command, Department of the Navy ("WESTDIV"), were happy that plaintiff chose to pave to the contours because additional concrete would be used. The Navy was very comfortable that plaintiff would use additional concrete and pave to the contours. Mr. Callahan stated that the Navy thought the proposed use of the extra concrete was "wonderful."

Three other WESTDIV engineering personnel, who had responsibilities for the project, had no particular recollection of the material facts.

Lt. Commander Applegate stated that he did not remember specifically when plaintiff raised the discrepancy between the drawings, but it was prior to commencement of paving. Lt. Commander Applegate concurred with Lt. Markey's decision to allow plaintiff the option of paving to the contours or placing the eight-inch overlay. He conceded that he was concerned with the ponds that formed after it rained. When asked about plaintiff's view of a concrete overage needed to pave to the contours, Lt. Commander Applegate stated: "I don't have the authority, nor does the local office have the authority to waive any warranty of construction or noncompliance with the specifications." Lt. Commander Applegate expressed the view that if the contractor put down an eight-inch PCC overlay, it would not be in accordance with the plans and specifications of the contract. He also opined that if the ponding was carried over to the final surface, the finished product would be unacceptable.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over material facts, or facts that might affect the outcome of the suit under the governing law, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* Defendant, as the moving party, has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). As the party opposing the motion, plaintiff has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Any evidence presented by plaintiff is to be believed and all justifiable inferences drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. Uncontested material facts have been found consistent with the rule that, in respect of any facts that may be considered as contested, plaintiff, as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984),

*cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985).

Defendant contends that plaintiff's claim for extra compensation based on a constructive change fails to state a claim because plaintiff was not directed to do extra work. Both parties recognize that if a change is found to exist in this contract, it would be a constructive change.

▇▇▇ To recover under the contract's changes clause on the basis of a constructive change—for work beyond that required by the contract, but without a formal change order—the contractor must show that the requirements of the contract were enlarged and that the additional work was not volunteered, but was ordered by a government officer having the requisite authority. *Len Co. & Assoc. v. United States,* 181 Ct.Cl. 29, 38–39, 385 F.2d 438, 443 (1967). It is insufficient to show that the Government disapproved a mode of performance; rather, the Government must have directed the contractor to perform the additional work. *Singer Co., Librascope Div. v. United States,* 215 Ct.Cl. 281, 289–90, 568 F.2d 695, 701 (1977). Plaintiff and defendant's views diverge, first, on whether the alternative methods of performance relieve the Government from liability for the overage of concrete encountered by plaintiff, thereby rendering plaintiff a volunteer; and second, whether the option of alternative methods was illusory, thereby providing plaintiff with only one method of performance requiring the use of additional concrete.

Plaintiff asserts that in order to be found a volunteer, the alternative methods of performance proposed by the Navy must be real. If there is only one realistic course of performance, the contractor is entitled to an equitable adjustment. Plaintiff cites the following cases in support of its proposition.

In *Blake Construction Co., Inc. v. United States,* 57–1 B.C.A. (CCH) ¶ 1,281 (1957), the contractor was given specific instructions in the plans and specifications to accomplish concrete underpinning in a particular manner. The contractor proposed an alternative method outside of the plans and specifications calling for dry-packing cement, which the Government accepted. However, the Government did not view the proposed method as additional to the contract requirements and refused the contractor compensation for the additional cost of dry-packing. The contractor attempted to maintain its claim by asserting that it did not act as a volunteer. The Armed Services Board of Contract Appeals (the "ASBCA") determined that the contractor's performance, although acceptable to the Government, was outside what was required by the plans and specifications of the contract and thus did not constitute a change. The contractor was not foreclosed from performing in accordance with the contract specifications. Although the contractor knew that its proposed method was acceptable, it was not given any reason to believe that the Government would be willing to pay more money for the alternative method.

*Southern Construction Co., Inc.,* 57–2 B.C.A. (CCH) ¶ 1,563 (1957), is put forward in support of plaintiff's argument that if two alternative methods of proceeding are available, one cannot be illusory. *Southern* may stand for this proposition, but only within the context of its facts. The contract in *Southern* was for modernizing the existing wiring systems in two military structures. The performance of this task required the removal of existing BX cable and its subsequent reinstallation. The contract required that wherever practicable, the existing BX cable should be reused. The contractor began removing the cable intact; however, the government inspector rejected the reuse of the BX cable after removal. Since the cable was not to be reused, the contractor discontinued its attempts to remove the cable intact. Thereafter, the contractor made a claim for the cost of installing new cable. The contracting officer denied the claim on the ground that the contractor had the option of installing the new cable, but should have used the old BX cable where practicable. The board found that although reuse was authorized under the contract, the inspector's position made the contractor's at-

tempt to save the cable during removal futile, since it was clear that the inspector did not consider reuse of the cable acceptable.

*Lasker–Goldman Corp.*, 64–1 B.C.A. (CCH) ¶ 4,200 (1964), involved a claim for finishing work performed on concrete ceilings. The contract specifications were inadequate to achieve a desired aesthetic effect. The contractor claimed "that the Government required a method of finishing which was in excess of the requirements of the specifications." 64–1 B.C.A. (CCH) ¶ 4,200, at 20,4004. The government inspector on the job site attempted to require the contractor to perform work outside of the original contract specifications. The inspector originally suggested that the contractor paint to an alternative specification within the contract for interior finishing, but ultimately concluded that a new method outside the contract specifications should be used, claiming that the specifications were in error. The inspector asserted that in order to meet the requirements of the contract, the contractor must perform the work in the manner that he directed.

The contractor prepared two finished samples that conformed to the contract specifications, both of which the inspector rejected. The contractor then created another sample which was accepted and that conformed to the inspector's required performance. The contractor made a claim for the cost of the additional work. The Government countered contending the contractor was required to perform an alternative method because it had failed to comply with earlier specifications as to alignment of forms, which affected the subsequent appearance. The ASBCA found that the contractor had performed the earlier work to the contract specifications and ruled that the contractor was only required to perform the finishing work in compliance with the contract specifications. Since the inspector prevented the contractor from proceeding under the specifications, the contractor was entitled to an equitable adjustment for the additional work performed.

Neither of these cases is analogous or particularly relevant to the situation at bar.

In both *Southern* and *Lasker–Goldman*, the contractor was given specific instructions by an individual with authority to perform work outside the contract specifications. The contractor in *Southern* was relieved of the performance specified in the contract; if the contractor in *Lasker–Goldman* had performed to the contract specifications, the work would have been found unacceptable.

■ Plaintiff claims that it was presented with an illusory choice and, therefore, by implication that it was required to pave to the contours. Plaintiff was given the option of paving to the contours or laying an eight-inch PCC overlay on top of the bond breaker. The only specific instruction plaintiff was given was that whichever option it chose would be "at no change in the contract cost or time," as stated in Lt. Markey's September 27, 1985 letter. Plaintiff contends that if it had paved an eight-inch overlay, the finished product would have been unacceptable. According to plaintiff, Lt. Commander Applegate's unwillingness to waive the contractor's Warranty of Construction made the alternative choice illusory. Plaintiff maintains that if it had placed an eight-inch overlay, it would be required under the warranty to correct the ponding problem, perhaps at a later date.

Since it could have been foreseen that the problem or the discrepancy in the drawings would have been deemed a defect in design, plaintiff's obligation was upon its discovery to bring the defect to the attention of the Government. Plaintiff only warrants that "work performed under the contract conforms to the contract requirements and is free of any defect of equipment, material, or design furnished, or workmanship performed...." Provided that plaintiff did not supply the defective design, it would not have become liable if it performed in accordance with the Navy's suggested course. Paragraph 62(f) of the General Provisions establishes that a contractor will not be liable for defects caused by a design furnished by the Government. Lt. Commander Applegate's refusal to waive any warranty would not affect the

outcome. However, the court is unwilling to rule on motion that the Navy's own option to deny a design defect, to force plaintiff to remove the pavement and repave to the contours, and to litigate plaintiff's claim—in view of what the evidence at this juncture indicates the Navy knew about the probable unacceptability of eight-inch pavement—could not constitute posing plaintiff an illusory choice. Trial might also establish, alternatively, that Lt. Markey had the requisite authority to absolve plaintiff of any responsibility for putting down an eight-inch layer—the position taken by Lt. Markey in his September 27, 1985 letter, declarations, and deposition testimony—so that the Navy could be said to have presented plaintiff with a choice that was not illusory.

▪ Plaintiff claims that it is entitled to an equitable adjustment based on the Navy's warranty to supply adequate plans and specifications. *Laburnum Constr. Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963). Plaintiff discusses several cases in support of its position.

In *Hol–Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634 (1966), a contract contained defective specifications since the engine called for could not perform the task required. Plaintiff had attempted to comply with the Government's specifications, whereupon it was discovered that the specifications were defective. The court ruled that the contractor could recover the additional costs incurred, since the Government had breached its warranty to provide adequate specifications. The court stated: "When the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result...." *Hol–Gar,* 175 Ct.Cl. at 525, 360 F.2d at 638 (citations omitted). The court went further stating that "[i]f the warranty is breached, *i.e.,* the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications." *Id.*

The factual backdrop to the case at bar is quite different from what transpired in *Hol–Gar.* The design defect in this case was identified prior to the time when the contractor had begun the paving work, and plaintiff was given an option which would have eliminated the need for it to incur any additional costs. Plaintiff was not entitled to turn a blind eye toward the Navy's attempt to remedy the situation. As a general proposition, the Government must be allowed to lower its expectations to correct a mistake prior to the time that the contractor begins its performance, if the contractor is absolved from an obligation to provide a more costly product.

In *La Crosse Garment Mfg. Co. v. United States,* 193 Ct.Cl. 168, 178–79, 432 F.2d 1377, 1383–84 (1970), the contract called for the production of gas masks. The Government supplied defective specifications on which the contractor sought clarification before it began work. The Government's answers were not forthcoming, so the contractor proceeded without clarification, but maintained its request for clarification. Because of the defect in design, the contractor sought an equitable adjustment. The court concluded that the contractor was entitled to an adjustment which was measured by "the degree of interference with satisfactory performance." 193 Ct.Cl. at 181, 432 F.2d at 1384–85. At trial plaintiff may establish that the Navy encouraged it to pave to the contours and thereby overrode the option to provide an eight-inch overlay.

Defendant argues unpersuasively that if the Navy had directed plaintiff to perform the work for which it seeks compensation, plaintiff failed to lodge an adequate protest. Plaintiff's notification that there was a discrepancy in the drawings, coupled with the knowledge by the Navy that paving to the contours may require additional concrete, would provide sufficient basis for a protest if plaintiff were directed to perform in accordance with the Navy's defective specifications.

## CONCLUSION

Based on the foregoing, defendant's renewed motion for summary judgment is

denied. Trial has been set by separate order entered this date.