**IBI SECURITY SERVICE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 645–88C.**

United States Claims Court.

Oct. 27, 1989.
As Amended Jan. 16, 1990.

Donald E. Barnhill, San Antonio, Tex., for plaintiff.

John E. Kosloske, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Barbara G. Robbins, Office of General Counsel, Dept. of Health and Human Services, of counsel.

## OPINION

NETTESHEIM, Judge.

This case, before the court after argument on cross-motions for summary judgment, involves a dispute over the appropriateness of an equitable adjustment to com-

pensate a contractor for a government-mandated employee wage and benefit increase.

## FACTS

The following facts are undisputed. On March 17, 1986, the National Institute for Environmental Health Sciences ("NIEHS") issued Invitation for Bids No. 273–86–B–0009 (the "IFB"). The IFB requested bids for providing security service for one "base year" and two additional "option years." Security service was to be provided to government buildings located at Research Triangle Park, North Carolina. Of the 25 firms that submitted bids on the contract, IBI Security Services, Incorporated ("plaintiff"), was determined to be the second lowest bidder. After NIEHS permitted the original low-bidder to withdraw its proposal, plaintiff was awarded a firm fixed-price service contract on June 20, 1986.

During spring 1987 plaintiff began collective bargaining negotiations with representatives of the Industrial, Technical, and Professional Employees Division of the National Maritime Union of America (the "union"), as agent of the security guards at the Research Triangle Park facility. As a result of those negotiations, plaintiff and the union agreed upon a wages and benefits package of $455,234.60 for 1987. The agreement amounted to an increase of $124,199.76 over the prior year.

Issuing modification number 4 to the contract, the contracting officer exercised the first of the contract options on June 16, 1987. Weeks later, in a letter dated July 14, 1987, plaintiff informed NIEHS that the Department of Labor (the "DOL") would soon be issuing a Wage Determination covering security guards at the facility. The DOL's determination would set the minimum allowable wages and benefits to be offered by employers. In the July 16 letter, plaintiff requested that NIEHS begin negotiations on the amount of a contract adjustment covering the anticipated increases.

On September 25, 1987, the DOL issued a Wage Determination providing that plaintiff's security guards were to be "paid wage rates and fringe benefits set forth in the bargaining agreement(s)" entered into between plaintiff and the union. When plaintiff appealed for an adjustment in the contract price—on the ground that the DOL's Wage Determination was a compensable increase in plaintiff's costs—the contracting officer denied plaintiff's claim. Plaintiff filed suit in this court on November 14, 1988.

## DISCUSSION

Plaintiff argues that both Temporary Regulation ("Temp.Reg.") 76, 49 Fed.Reg. 6,726 (1984), and the Christian doctrine, *G.L. Christian & Associates v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, *rehearing denied*, 160 Cl.Ct. 58, 320 F.2d 345, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), require inclusion of a price adjustment clause into its contract with the Government. Temp.Reg. 76 had the effect of carrying forward clauses required to be included in government contracts during a transition between two sets of procurement regulations. However, since the price adjustment clause was not included in plaintiff's contract, plaintiff invokes the Christian doctrine, whereby clauses and requirements that are required to be inserted into government contracts are "read into" the body of the contract by operation of law. The goal served by this action is that "procurement policies set by higher authority [are] not ... avoided or evaded (deliberately or negligently) by lesser officials...." *G.L. Christian*, 160 Ct.Cl. at 66, 320 F.2d at 351.

Further, plaintiff asserts that it was wrongful for NIEHS not to include a price adjustment clause in the contract and that defendant should be estopped from denying that an adjustment is due. Defendant counters that not including a price adjustment clause in plaintiff's contract was a proper and lawful action and asks this court to declare, as a matter of law, that plaintiff is not entitled to recover for the increases in its costs.

Summary judgment is appropriate when there is no genuine issue of material fact in dispute and the moving party is entitled to

judgment as a matter of law. RUSCC 56(c). The case is well suited for summary disposition, as the parties are in accord on all material facts. Both plaintiff and defendant agree that NIEHS' exercise of the contract option bound both parties to perform under the contract and that as a result of plaintiff's collective bargaining negotiations, plaintiff suffered increased operation costs during the option year. What remains in this dispute is a question of law—the obligation of NIEHS, if any, under statute, regulation or prior cases to compensate plaintiff for its added expenses.

### 1. Government obligation to include price adjustment clause

██ The parties agree that it had been the prior practice of NIEHS officials, under applicable regulations, to include price adjustment clauses in service contracts. Such a clause would have permitted adjustments so as to compensate contractors for employee wage increases. *See* Federal Procurement Regulation (sometimes referred to as "F.P.R.") § 1–12.905, 46 Fed. Reg. 62,276 (1982), 41 C.F.R. § 1–12.904–3 (1982).[1] The parties further agree that no such clause was included in the instant contract. Moreover, the Federal Acquisition Regulations ("F.A.R.") 48 C.F.R. §§ 1–4452.239–71 (1984), effective April 1, 1984, did not incorporate this clause.

In arguing that inclusion of a price adjustment clause was warranted under the Federal Procurement Regulations and that critical provisions of the F.P.R. were "not necessarily obliterated in areas without FAR coverage", Plf's Br. filed Aug. 4, 1989, at 6, plaintiff appears to concede that the F.A.R. did not direct the contracting officer to include a price adjustment clause in the contract. Instead, plaintiff asserts that an interim provision, Temp.Reg. 76, required government agencies to use the old contract clause during the interval be-

tween administering contracts according to the F.P.R. and the date on which the F.A.R. became effective. Plaintiff relies heavily on the "Explanation of Changes" in arguing the effect of Temp.Reg. 76. Introductory paragraphs 5(a) and (b) read:

Pending the publication of permanent revised regulations in FPR Subpart 1–12.9, *agencies shall follow the provisions of 29 CFR Part 4, Labor Standards for Federal Service Contracts (48 FR 49736, October 27, 1983).* To the extent that FPR Subpart 1–12.9 *differs* from the DOL regulations after January 27, 1984, the DOL regulations shall apply.

The revised contract clauses required by the DOL regulations for contracts over and under $2,500 are set forth in sections 4.6 and 4.7 of revised 29 CFR Part 4 (see 48 FR 49766, October 27, 1983) are attached. These clauses are applicable only to contracts entered into pursuant to invitations for bids issued or negotiations concluded on or after January 27, 1984 and *shall be used in lieu of the clauses set forth in § 1.12.904.*

Temp.Reg. 76, 49 Fed.Reg. 6,726, at 6,728 (emphasis added). According to plaintiff, because the DOL's regulations did not displace the old F.P.R. regulation—with the price adjustment language—NIEHS was required to include the F.P.R. clause in the contract.

Plaintiff asserts that its reading of Temp.Reg. 76 is bolstered by the later issuance of Fed.Acq.Cir.No. 84–1 (Mar. 26, 1984). In pertinent part, the circular reads:

ITEM VII SERVICE CONTRACT ACT OF 1965.

Pending new FAR coverage pertaining to the Service Contract Act of 1965, civilian agencies, other than NASA, shall continue to follow policies and procedures in FPR Temporary Regulation 76, Revision of Labor Standards for Federal

---

1. In pertinent part, the clause reads:

(c) The contract price [or] contract unit price labor rates for the option or renewal periods of this contract will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits

to the extent that these increases or decreases are made to comply with:

(i) The Department of Labor determination of minimum prevailing wages and fringe benefits applicable at the beginning of the option or renewal period. . . .

Service Contracts, February 23, 1984, and agency procedures instituted thereunder. DoD and NASA will provide separate direction in accordance with their established procedures.

The coverage in Subpart 22.10, Service Contract Act of 1965, and the contract clauses at 52.222–40 through 52.222–44 are removed.

Plaintiff asserts that the direction to "follow policies and procedures in F.A.R. Temporary Regulation 76" refers back to the F.P.R. regulations that were not displaced and brings the price adjustment clauses "forward" for inclusion in the instant contract.

Plaintiff selectively reads the language in Item VII of the circular. As defendant points out, the F.A.R. clauses that are "removed" under Item VII relate directly to price adjustments. F.A.R. clause 52.222–43 is captioned: "Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiyear and Option Contracts)." Although not identical to the earlier F.P.R. clause, this clause fulfills a similar function as F.P.R. § 1–12.904–3—awarding contractors an adjustment in the contract price for increased costs in complying with a DOL wage determination. By removing this clause from the applicable regulation, the F.A.R. drafters manifested their intention that inclusion of the price adjustment clause was no longer required.

It is not clear that Temp.Reg. 76 had the effect plaintiff ascribes to it. First, if Temp.Reg. 76 was designed to give guidance to agency officials pending the development of regulatory changes, it is curious that the regulation makes no mention of adjustments to the contract price for increases in employee wages. The regulation does mandate that the contracting officer be apprised by the contractor of any increases in the wage rate due to "conforming" the wages of "unclassified" employees,[2] and that the contracting officer withhold any amounts due should the contractor not pay its employees the prescribed minimums, Temp.Reg. 76, § 4.6(i), 49 Fed.Reg. 6,726, at 6,730. Nonetheless,

no mention is made in these mandatory clauses of a requirement for price adjustment. It is reasonable that after having required the contractor to pay the stated minimums and to notify the contracting officer of its compliance, the clauses would have also provided a mechanism for compensating the contractor, if such an adjustment were intended. Defendant's reading of the regulation as mandating only the contractor's compliance with basic minimum labor standards is more reasonable. The Christian doctrine is available only when relevant statutory or regulatory provisions are required to be included in an agency's contracts. *See North Star Aviation Corp. v. United States,* 198 Ct.Cl. 178, 180, 458 F.2d 64, 65 (1972); *Johnson v. United States,* 15 Cl.Ct. 169, 172 (1988).

In introductory paragraph 2, the regulation states that it expires on January 31, 1986—six weeks before NIEHS' IFB was issued and almost five months before plaintiff was awarded the contract. 49 Fed. Reg. 6,726, at 48,874. Although the policies and procedures contained in Temp.Reg. 76 applied to contracts governed by the FAR "[p]ending new coverage pertaining to the Service Contract Act of 1965," Fed. Acq.Cir.No. 84–1 Item VIII, these procedures only concern standards for service contracts. It is therefore untenable to argue that NIEHS was duty bound to follow expired regulations as to price adjustments.

Plaintiff's position does not fare better even if Temp.Reg. 76 were read as sweeping into the contract all clauses and regulations that are not countermanded specifically by its terms. In introductory paragraph 2, the regulation states that it expires on January 31, 1986—six weeks before NIEHS' IFB was issued and almost five months before plaintiff was awarded the contract. 49 Fed.Reg. 6,726, at 48,874. It is therefore untenable to argue that NIEHS was duty bound to follow expired regulations, or that the terms of lapsed provisions should be inserted into the contract by operation of law. The Christian doctrine is available only when relevant

2. Temp.Reg. 76, § 4.6(b)(2)(iv)(B), 49 Fed.Reg.   6,726, at 6,729.

statutory or regulatory provisions are required to be included in an agency's contracts. *See North Star Aviation Corp. v. United States,* 198 Ct.Cl. 178, 180, 458 F.2d 64, 65 (1972); *Johnson v. United States,* 15 Cl.Ct. 169, 172 (1988).

Also significant is that the DOL does not share plaintiff's expansive reading of Temp.Reg. 76. Plaintiff cites a letter from Paula V. Smith, Administrator of the DOL's Wage and Hour Division, to Marcia Soward, NIEHS contracting officer. Ms. Smith wrote that it was her hope that NIEHS would take reasonable steps to ensure that plaintiff's employees received all compensation to which they were entitled legally and that contract clauses were "procurement matters strictly within the purview of the contracting agency." She also prefaced her remarks by stating that "[s]uch issues are matters for resolution between the contractor and the contracting agency in accordance with applicable procurement laws and regulations...." When a court is asked to construe the meaning of an administrative regulation, deference to the agency's interpretation is in order. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *see Hilo Coast Processing Co. v. United States,* 7 Cl.Ct. 175, 177 (1985) (agency construction need not be only reasonable one, or even result court would have reached, if it forms rational basis for the administrative conclusion) (citing cases).

This case thus differs in its key facts from *Centel Communications Co.,* GSBCA No. 8,218, 89–1 B.C.A. (CCH) ¶ 21,225, 1988 WL 111496. The F.P.R. regulation upon which the contracts relied was in force and applicable to the contract, though omitted by the contracting officer. *Id.* at 107,069. Finding the clause was "required," the board read the missing clause into the contract using the Christian doctrine and ruled that contractor was entitled to an upward adjustment in the contract price.

Similarly, *Semo Security Guard Corp.,* GSBCA No. 9,503, 89–2 B.C.A. (CCH) ¶ 21,614, 1989 WL 143 81, is inapposite. The parties had contracted to share the risk of any increase in wages resulting from a DOL wage determination. The contract provided that the option price, "as escalated" would not be greater than 15 percent over the base year's price. *Id.* at 108,800. No evidence of an intent to share the risk and burden of wage increases exists here.

2. *Obligation to inform plaintiff that no price adjustment clause was included in the contract*

Plaintiff also argues that NIEHS' failure to give notice to IBI that no price adjustment clause was included in the contract and the failure to provide a reasoned explanation for this "departure from prior practice," Plf's Br. filed Aug. 4, 1989, at 30, amount to arbitrary and capricious acts.

From the terminology used in plaintiff's brief, and the cases cited, it is assumed that plaintiff's argument draws upon principles of administrative law. The application of those doctrines is not appropriate in this case; indeed, plaintiff's argument would lead to an inappropriate result. Plaintiff cites *Atichson, Topeka Sante Fe Ry. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Secretary of Agriculture v. United States,* 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); and *Motor Vehicles Manufacturers Assn. v. State Farm Mutual,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In each of these cases, the Supreme Court was reviewing an agency's departure from established rules and practices. However, the salient point is that the rule or practice had been developed by rulemaking or adjudication under the Administrative Procedure Act (the "APA"). 5 U.S.C. §§ 500–559 (1988). The clauses and regulations that govern this contract have never been subject to the APA. Matters relating to public contracts have always been exempt from APA coverage. 5 U.S.C. § 553(a)(2). Whatever benefit notice might have been

to plaintiff, administrative law principles did not obligate NIEHS to inform plaintiff that no price adjustment clause was included in the contract. "Courts should not, where Congress has not done so, subject purchasing agencies to the delays necessarily incident to judicial scrutiny at the instance of potential sellers, which would be contrary to traditional government practice and would create a new concept of judicial controversies." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 130, 60 S.Ct. 869, 878, 84 L.Ed. 1108 (1940).

The Supreme Court's opinion in *Motor Vehicles Manufacturers Association* supports this reading of the APA. The Court held that review of agency rescission or modification of prior practices should be conducted in the same manner as review of agency action in promulgating standards. 463 U.S. at 41. Applying identical standards to plaintiff's challenge to rescission of a prior practice as would have been applied had plaintiff challenged the promulgation of the standard, plaintiff is foreclosed. Plaintiff could not have challenged the mandatory inclusion of a price adjustment clause in a government contract as arbitrary and capricious because such matters are exempt under the APA. Therefore, plaintiff cannot complain that NIEHS departed from this prior practice without affording it notice or opportunity to comment.

3. *Obligation to grant plaintiff a price adjustment under the changes clause*

■ A contractor may recover its increased costs only if they result from additional work, beyond the minimal standards required by the contract, and that work is ordered by the words or deeds of government agents. *See Calfon Constr. Co. v. United States*, 17 Cl.Ct. 171, 177 (1989) (order denying motion for summary judgment) (citing cases); R. Nash & J. Cibinic, *Administration of Government Contracts* 306 (2d ed. 1985). Neither element, a change or an order, exists here. Plaintiff was under no additional duty beyond the minimal standards required by the con-

tract, nor were increased wages ordered by contracting officials.

This last point is particularly significant, as plaintiff relies heavily on *Philco–Ford Corp.*, 72–1 B.C.A. (CCH) ¶ 9,390. The contractor received Wage Schedules from the United States Headquarters, Vietnam, directing it to pay a "precise wage which is both minimum and maximum," *id.* at 43,-612, to its Vietnamese employees. When the Wage Schedules were revised upward by Army Headquarters, *Philco–Ford* suffered losses. The contractor in *Philco–Ford* was granted an equitable adjustment because control over its wages lay entirely with the Government. Directed by government officials—upon pain of termination for default—to pay a precise wage, a change occurred when the Government adjusted the wage schedules.

■ The distinction between mandating a precise wage and mandating a minimum wage is crucial. As explained by the Court of Claims in *Sunswick Corp. v. United States*, 109 Ct.Cl. 772, 800, 75 F.Supp. 221, *cert. denied*, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755 (1948), prescription of a precise wage evidences a different contractual relationship and intent than requiring a contractor to provide its employees with merely a stated minimum. The point is illustrated by a comparison between the contract in *Sunswick*, in which a precise wage had been required, and the contract in *LeVeque v. United States*, 96 Ct.Cl. 250 (1942), in which only a stated minimum was required. The *Sunswick* court explained:

> The contract documents do not provide merely that the wage rates paid by the contractor shall *be not less* than those set forth in the specifications, nor declare that the Government will not consider any claims for additional compensation occasioned by payment of a wage rate in excess thereof, and that all disputes in regard to the payment of wages in excess of those specified shall be adjusted by the contractor, such as was written into the contracts involved in *United States v. Beutas*, [324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354 (1945) ], and *LeVeque et al. v. United States*, [96 Ct.Cl. 250

**112**

(1942)]. The contractor is simply told that the amounts to be paid his workmen shall be computed at wage rates "not less or more than" the rates stated in the specifications, and that the wages specified shall be the maximum to be paid.... As stated in the *LeVeque* case such provisions as were there present (but not here) would indicate that the parties were not establishing a wage schedule, but rather a flooring for wages. They evidence an intent that the contractor is to assume the risk of all wage increases in excess of the minimum which subsequent conditions, not the fault of the defendant, shall cause him to pay.

109 Ct.Cl. at 800 (emphasis in original). Thus, *Sunswick* stands for the proposition that when contract clauses require a minimum wage, but neither a maximum limit or precise amount, the contract evidences an intent that the contractor assume the risk of an increase in the minimum allowable rate. A precise or maximum limit on wages, on the contrary, suggests government control over wage and benefit levels—a matter about which a contractor cannot reasonably be expected to predict or prepare. *See id.* at 802–03.

■ A similar analysis should apply in this case. Plaintiff had sufficient control over wages and benefits so as to make *Philco–Ford* and *Sunswick* unavailing. Plaintiff conducted its own negotiations with the union and without involvement or direction from agency officials. It should not now be allowed to claim that NIEHS officials directed it to accept obligations beyond the minimum required by the contract. *But see Geronimo Serv. Co.*, ASBCA Nos. 14,686, 14,687, 70–2 B.C.A. (CCH) ¶ 8,540.

*Space Age Engineering, Inc.*, ASBCA No. 16,588, 72–2 B.C.A. (CCH) ¶ 9,636, is in accord with *Philco–Ford* and *Sunswick* —holding that upward adjustments should be granted only in those cases in which the Government exercises strict control over the wages to be offered, beyond stating a minimum wage that must be met:

To the extent that Space Age increased its fringe benefit payment to bring them into compliance with the Wage Determination, it is not entitled to recover.

As it was wrongful for the Government to insist that because Space Age was a successor contractor it had to pay its employees to so-called "conformed" wages, doing so constituted a change for which Space Age was entitled to be compensated.

72–2 B.C.A. (CCH) ¶ 9,636, at 44,996 (citation omitted). The ASBCA makes clear that because "pressure was applied by the Government under circumstances which persuaded Space Age, and we think would have persuaded any reasonable contractor, to believe that it was required to make the reinstatement and pay the increased pay....", that the contractor was entitled to a partial adjustment in the contract price. *Id.* at 44,995. Government control of wages formed the basis for an entitlement under the changes clause, and there is no such control in this case.

■ Lastly, plaintiff asserts that NIEHS should be estopped from denying that an equitable adjustment to plaintiff's contract is due. Citing *Broad Avenue Laundry & Tailoring v. United States*, 231 Ct.Cl. 1, 681 F.2d 746 (1982), plaintiff sets out the elements of factual estoppel and argues that contracting officer Soward was under a duty to award plaintiff an adjustment in the contract price. *Broad Avenue Laundry* is factually distinguishable.

The Court of Claims recounts that when the union representative and the petitioner approached the contracting officer in *Broad Avenue Laundry*, the contracting officer agreed to incorporate the new prevailing wage rates into the contract. Despite the fact that "[n]either party contends that the [contracting officer] correctly applied the applicable law," 231 Ct.Cl. at 3, 681 F.2d at 747, and the court characterized her actions as "blunders," the court held that the contracting officer had requisite authority to direct the contractor to pay wage rates beyond the prevailing rates. 231 Ct.Cl. at 4, 681 F.2d at 747–48. Having given a lawful order, within the scope of her authority, the Government

was estopped from denying the validity of the adjustment.

Estoppel of the Government in *Broad Avenue Laundry* was warranted because the contracting officer, having exercised her authority, created a reasonable basis for the contractor's reliance. As the court explained:

> We think it is with small dignity indeed that respondent argues that an illegality should be perceived to [the contractor] that was not perceivable to its own contracting officer.... [The contractor] didn't know, frankly. If he had read the regulation he still would not have known. He asked and got his answer, which respondent says he should have known was wrong.

231 Ct.Cl. at 8–9, 681 F.2d at 750; *cf. United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir.1973) (estoppel of Government required to protect basic notions of fairness and prevent serious injustice). Plaintiff in this case is not similarly situated. Ms. Soward's "awareness" of agreements between plaintiff and the employee's union, in the absence of conduct upon which plaintiff could reasonably rely, is simply not relevant. *Cf. Emeco Indus., Inc. v. United States*, 202 Ct.Cl. 1006, 1014–18, 485 F.2d 652, 657–59 (1973) (where Government had conducted on-site inspection and placed an order for $8,247.52 worth of goods, it was reasonable for contractor to assume it had been awarded contract for entire production quantity); *Stevens Mfg. Co. v. United States*, 80 Ct.Cl. 183, 192–93, 8 F.Supp. 720, 724 (1934) (estoppel appropriate when contractor's conduct changed relationship between the parties, and repudiation of agreement was contrary to equity and good conscience). Estoppel is not appropriate upon these facts.

Similarly, plaintiff should not be permitted to rely upon *Electronic Systems USA, Inc.*, ASBCA No. 26,063, 82–1 B.C.A. (CCH) ¶ 15,521, for the proposition that where no escalation clause exists for increases in wages and benefits, government contractors are entitled to increases in the contract price under the changes clause. In *Electronic Systems* a clerical error resulted in the substitution of the "wrong" clause instead of terms required under the regulation. As the ASBCA noted, however, whatever clause was used, under either the correct or incorrect language, the contractor would be entitled to an adjustment for increased wages and benefits in the option years. *Id.* at 76,993. The board seems to have decided the case upon an estoppel theory; having failed to insert the proper clause into the contract, the Government was not permitted to argue that the contractor "should have known" that the costs it sought to recover—beyond wages and benefits—were not compensable.

### CONCLUSION

Based upon the foregoing, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.