**HOL–GAR MANUFACTURING CORPORATION**

v.

**The UNITED STATES.**

No. 203–64.

United States Court of Claims.

May 13, 1966.

Theodore M. Kostos, Philadelphia, Pa., for plaintiff. Stassen, Kephart, Sarkis & Kostos, Philadelphia, Pa., of counsel.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before LARAMORE, Acting Chief Judge, WHITAKER, Senior Judge, and DAVIS and COLLINS, Judges.

WHITAKER, Senior Judge.

This case is before the court on defendant's motion and plaintiff's cross-motion for summary judgment. Plaintiff seeks reimbursement for additional costs incurred in trying to perform its contract with defendant under specifications which, prior to amendment, it contends were defective, in that the desired performance could not be attained by following them. After the Contracting Officer had denied its claim, plaintiff took an appeal to the head of the Department, as required by the "Disputes" clause of the contract. The Armed Services Board of Contract Appeals, acting for the head of the Department, also denied plaintiff's claim. For reasons hereinafter set out, we hold that the Board was in error and that the plaintiff is entitled to recover for costs which it incurred in trying to perform under defective specifications.

On December 13, 1956, the Air Materiel Command of the Department of the Air Force issued a Request for Proposals for the manufacture and delivery of 107 electric generator sets, in accordance with Exhibit RADC-2491, which was an elaborate set of specifications drafted by the Air Force Air Research and Development Command. The specifications provided specific size and weight limitations for the generator unit and set out various environmental conditions under which the unit was to be operable. It also provided that the unit be capable of operating 23 hours a day

for six months (4,000 hours), with only normal maintenance.

With regard to the diesel engine, which is of particular concern in this case, RADC–2491 called for an air-cooled, multi-cylinder, full stroke type which "shall have demonstrated, through prior test by independent or government laboratory, sufficient durability of the basic engine to meet the requirements of this specification." It then went on to provide for the amount of cubic inch displacement; the direction of rotation and operating speed of the engine; the type of fuel to be used; the components of the fuel system, including the type of fuel tank, fuel transfer pump, fuel replenishment system and fuel piping; the type of air induction, exhaust and cooling systems; the type of lubrication system, including the kind of oil filters and lubricating oils to be used; the type of pistons, valves, crankshaft, main bearings, camshaft, flywheel, cylinder block, cylinder head, crankcase and connecting rods; the components of the starting system, including the type of cranking motor, battery charging system and storage battery assembly; and the type of engine speed governing system.

The Technical Proposal, among other things, was to give detailed analysis of the proposed method or methods of compliance with each portion of the governing specifications; to outline basic difficulties or problems, if any, in meeting the specifications; and to provide a complete and detailed statement clearly defining the bidder's recommended solution of any problems outlined.

On January 31, 1957, after a bidders' conference at which contractual details were discussed and technical details of the specifications were reviewed, plaintiff submitted its Technical Proposal. In accordance with the Request for Proposals, this Technical Proposal set forth the components and materials which plaintiff proposed to use and the methods it proposed to employ in complying with the specifications. With regard to the diesel engine, plaintiff submitted that the general requirements of the specifications limited consideration to three models of engines—the American MARC Hallet AC2, the Onan DPR, and the International Fermont FA98. It then explained why it thought the latter two models would not meet, in several important details, the more specific requirements of the specifications.[1] It then outlined the American MARC Hallet AC2 engine (hereinafter MARC) which, with only slight modification, it thought would meet the design requirements and would probably also meet the performance requirements of the specifications, since it had successfully passed tests by the Marine Corps. Plaintiff accordingly proposed the use of a slightly modified MARC engine, as one of the components of the generator set.

On the basis of this Technical Proposal, plaintiff and defendant on March 25, 1957, entered into a negotiated fixed-price supply type contract for the manufacture and delivery of the 107 generator sets for a total contract price of $467,-717.60.

The first item in the contract schedule called for the delivery of design data within 70 days after receipt of the contract, showing specifically and in detail how plaintiff meant to comply with the specifications, Exhibit RADC–2491, supra. The second item in the schedule called for the manufacture of three pre-production samples, designated in the contract as First Articles. One of these was to be delivered within 50 days after approval of the design data, for testing and approval by defendant. The other two were to be subjected to tests by plaintiff to determine whether they complied with the specifications. The results of these latter tests were to be submitted to the defendant within 170 days after approval of the design data. The remainder of the generator sets were to be manufactured and delivered at monthly

---

1. The Onan engine was found to be unsuitable primarily on the ground that use of it would require exceeding the weight and size limitations for the generator sets.

intervals after approval of the test results.

In a provision of the contract entitled "Approval of Design, First Article Testing and Approval," it was provided:

(f) In the event testing of the First Articles [preproduction samples] * * reveals deficiencies in the First Articles the Contractor shall, without additional cost to the Government, promptly make such corrections in the First Articles to conform to the contract specifications and repeat any testing necessary to demonstrate compliance with the contract specifications.

\* \* \* \* \* \*

(h) If, as a result of testing of the First Articles, changes in the contract specifications are required, such changes shall be processed in accordance with Clause 2, "Changes" of the Contract General Provisions.

Plaintiff submitted the design data and received approval thereof on September 26, 1957. Thereafter it fabricated and commenced testing the preproduction samples to ascertain if they complied with the specifications. One of the provisions of the specifications required that the generator sets be "capable of operating 23 hours per day for a period of 6 months (4,000 operating hours) with only normal maintenance and without major overhaul." To ascertain compliance with the requirement, the specifications provided that the preproduction samples were to be tested in an endurance run of 2,000 hours with no more than normal maintenance. The test results were then to be projected to ascertain if the engine could run the required 4,000 hours.

After approximately 37 hours of the endurance run, the engine began to leak oil through the oil filler tube. The test was stopped and an examination made to determine the cause of the failure. Some changes were made and a second endurance test was started. After about 700 hours of operation, it was noted that temperatures of certain components of the engine were exceeding limits set forth in the specifications. This test was then stopped.

Meetings were held between representatives of plaintiff and defendant in an attempt to resolve the difficulties. At these meetings plaintiff's representatives stated that they did not believe that an engine of the design specified could meet the performance requirements, and that they believed the only solution was to change the specifications to permit the substitution of another engine. Plaintiff submitted several engineering change proposals which would allow the replacement of the MARC with a different engine. Defendant became convinced that plaintiff was right and accordingly, on September 23, 1960, the parties executed Supplemental Agreement No. 8 which amended the contract by relaxing the size and weight limitations of the specifications in such a way as to allow use of an Onan engine.

Plaintiff, in accepting the change, agreed that no claim would be made for any additional costs resulting from the substitution of the Onan engine, but it did reserve the right to submit a claim for costs incurred in attempting to meet the original specifications.

Thereafter, plaintiff completed the contract as amended and was paid the contract price.

Plaintiff then submitted its claim to the Contracting Officer for costs incurred in trying to perform within the requirements of the original specifications. Its claim was denied by the Contracting Officer and the denial was affirmed, after a full hearing, by the Armed Services Board of Contract Appeals.

As was pointed out above, the parties had agreed at the time of the execution of the contract that if, as a result of testing the preproduction samples, changes in the specifications were required, then such changes were to be processed in accordance with the "Changes" article of the contract. That portion of the "Changes" article relevant in the present case provided:

The Contracting Officer may at any time, by a written order * * *

make changes, within the general scope of this contract, in \* \* \* (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith \* \* \*. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. \* \* \*

■■ That changes in the specifications were required is clear from the fact that after numerous negotiation sessions, during which time the plaintiff was attempting unsuccessfully to comply with the specifications, they were changed by the execution of Supplemental Agreement No. 8. We are of opinion that this "change cause[d] an increase \* \* \* in the cost of \* \* \* performance of this contract," because the change in specifications made useless some of the expenditures plaintiff had made up to that point, but plaintiff was nevertheless out of pocket this money and it must be included in its cost of performance. Since the necessity for the change was not due to plaintiff's fault, but to faulty specifications, an equitable adjustment requires that plaintiff be paid the increase in its costs over what they would have been had no change been required.

The Armed Services Board of Contract Appeals has recognized the correctness of the allowance of costs incident to an attempt to comply with defective specifications. See, e. g., *J. W. Hurst & Son Awnings, Inc.*, 59–1 BCA ¶ 2095 at 8965 (1959), where the Board stated:

\* \* \* Where, as here, the change is necessitated by defective specifications and drawings, the equitable adjustment to which a contractor is entitled must, if it is to be equitable, i. e., fair and just, include the costs which it incurred in attempting to perform in accordance with the defective specifications and drawings. Under these circumstances the equitable adjustment may not be limited to costs incurred subsequent to the issuance of the change orders. [Citations omitted.]

We hold that the plaintiff is entitled to an equitable adjustment which will compensate it for the costs which it incurred in trying to perform in accordance with the original specifications that turned out to be defective.

■■ But whether or not costs incurred prior to the change come within the "Changes" article, plaintiff is nevertheless entitled to recover damages for breach of warranty. When the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Helene Curtis Industries, Inc. v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963); *R. M. Hollingshead Corp. v. United States*, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953). If the warranty is breached, i. e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications.

As was pointed out above, the defendant drafted the specifications for the generator sets and thereafter entered into a contract with the plaintiff to manufacture the sets in accordance with those specifications. The plaintiff assembled a generator set, following in all respects the governing specifications, and subjected it to the required tests. The desired performance could not be attained. The specifications were then changed. That the reason for the change was that the original specifications were defective is clear. The plaintiff tried for almost three years to attain the desired performance by following the original specifications; but it was only after the original specifications were changed by Supplemental Agreement No. 8 that it was able to comply with the specifications.

Defendant contends that our decision in *Austin Co. v. United States*, 314 F.2d

518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), is contrary to the foregoing. In the *Austin Co.* case, the parties entered into a contract to manufacture a Digital Data Recording and Transcribing System. Prior to the execution of the contract the Austin Co. reviewed the Government specifications and determined that the desired product would not result from following those specifications. It thereupon submitted a proposed substitute for the Government specifications, which it said would produce the desired product. When the specifications proposed by plaintiff turned out to be defective, we held that since it was the Austin Co. which had drafted the specifications, it was not entitled to recover.

It is readily apparent that Austin Co. v. United States, supra, is distinguishable from the present case. Here the governing specifications were entirely drafted by the defendant. Prior to execution of the contract, no changes in the specifications were suggested by the plaintiff and none were in fact made. The contract itself provided that to the extent of any inconsistency between the Government specifications and the plaintiff's Technical Proposal, the Government specifications were to control. The defendant was completely responsible for the governing specifications.

Defendant has asserted two counterclaims against plaintiff. The first alleges that defendant was damaged by plaintiff's failure to deliver the generator sets in the time originally scheduled. This counterclaim is dismissed on the merits since the plaintiff cannot be held for a failure to comply with impossible specifications. The second counterclaim alleges that the engine mountings on the generator set were defective and broke off on use of the engine. We are of opinion that this counterclaim is barred by the "Inspection" clause of the contract which precludes suit for non-latent defects after acceptance of the items. It is also dismissed.

For the above reasons, defendant's motion for summary judgment is denied. Plaintiff is entitled to recover the amount necessary to constitute an equitable adjustment or for damages in attempting to comply with defective specifications. Judgment is so entered, the amount to be determined under Rule 47(c) (2).

DAVIS, Judge (concurring).

On the plaintiff's claim, I rest my concurrence in the judgment on subsection (h), quoted and discussed in the court's opinion, ante. As I evaluate this record, neither party warranted the specifications, so that neither could claim a breach of contract because of misrepresentations or defective specifications, defendant could not terminate for default if plaintiff failed to produce because of a failure of design, etc. But subsection (h) did provide, specially, for an equitable price adjustment if the specifications turned out to be defective or impossible, resulting in a change in specifications. This provision seems to me applicable here to permit recovery of the costs of attempting to meet the original specifications. Subsection (f) placed the risk of deficiencies in the first articles, due to manufacturing defects, on the contractor, but subsection (h) shows that the risk of defects in the specifications themselves was not to be borne by the contractor if a change was ordered. To construe subsection (h) more narrowly, as defendant does, would leave it very little scope and merge it into the Changes clause, although the parties went out of their way to make it a separate provision. If there is ambiguity to its reach, the defendant, which drafted it, should pay the toll. That the specifications were in fact impossible, under a proper understanding of that term, is clear. See Johnson Electronics, Inc., 65–1 BCA ¶ 4628. On the counterclaims, I join the court's opinion.