**BLOUNT BROTHERS
CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 88–1479.

United States Court of Appeals,
Federal Circuit.

April 18, 1989.

William R. Lucas, Jr., of Bradley, Arant, Rose & White, Birmingham, Ala., argued, for appellant. With him on the brief, was E. Glenn Waldrop, Jr.

Mark A. Melnick, of the Commercial Litigation Branch, Dept. of Justice, argued, for appellee. With him on the brief, were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Thomas W. Petersen and E. Kathleen Shahan. Of counsel was Hayes P. Haddox, of the U.S. Army Corps of Engineers, Louisville, Ky.

Before FRIEDMAN and MICHEL, Circuit Judges, and BENNETT, Senior Circuit Judge.

MICHEL, Circuit Judge.

Blount Brothers Corporation (Blount Bros.) appeals the decision of the Armed Services Board of Contract Appeals (board), ASBCA No. 29862 (February 25, 1988), awarding a downward adjustment of $87,340.00 to the United States Army Corps of Engineers (government) because the gravel or "coarse aggregate" furnished pursuant to Blount Bros.' contract with the government failed to meet contract requirements as to color. We reverse because the board's Finding of Fact No. 14, i.e., that a tan and brown aggregate that would meet all of the contract specifications existed in Montgomery, Alabama, is not supported by substantial evidence; the board's conclusion that Blount Bros. failed to establish impossibility is, therefore, in error.

*Background*

Blount Bros. and the government entered into a contract dated August 12,

---

1982, for additions, alterations and improvements to the existing United States Air Force Hospital located at Wright–Patterson Air Force Base in Ohio.

Provision 6.2.2 of the contract specified that the concrete for use in connection with the hospital walls be made using tan and brown aggregate:

> Aggregates for normal weight concrete shall conform to ASTM C 33. Maximum nominal aggregate size shall be 1″ for slabs on grade and footings and ¾″ for all other work. Coarse aggregate for exposed ribbed concrete walls shall be *tan and brown washed river gravel.* Adequate supply of approved gravel shall be required to provide uniform concrete for all exposed work. (Emphasis added.)

In addition, Provision 8 stated with relation to the concrete mix that the goal was: "uniformity in texture, color and distribution of aggregate in [the] mix." Provision 19.2 explained how the ribbed concrete walls would be bush hammered in order to expose the aggregate consistently and completely.

The board supported its Findings of Fact Nos. 9 and 12 that the aggregate was not "tan and brown washed river gravel" using a photograph of a sample panel of bush hammered concrete containing the aggregate, Exhibit A–1, and a sample of gravel taken from a stockpile at the subcontractor's place of business, Exhibit G–3. Finding of Fact No. 9 reads:

> The contract required Blount to prepare sample concrete panels for examination and approval by Government (R4, tab C at 3A–4). On December 20, 1982, Blount poured the required sample concrete panels (tr. 1/100, 2/78, 4/179–181). After the concrete had sufficiently hardened Blount bush hammered the vertical ribs of the sample panel to expose the aggregate. Thereafter, Government examined the sample panel and observed that the exposed aggregate was not tan and brown. The aggregate was approximately 85% various shades of gray, white and blue. At most only 15% of the aggregate might be considered remotely

approaching the color requirement of tan and brown.... (R4, tab B2; tr. 1/112/13, 225, 2/190–91, 215–16, 3/130, 131, 133–134, 197, 4/31–33, 35, 109, 179–81; *exhs. A–1, –83, –85; exh. G–3*) (emphasis added).

Finding of Fact No. 12 reads:

> Blount decided to pour a second sample concrete panel containing a greater concentration of aggregate in the ribs. Such a panel was poured early in February 1983 (tr. 1/100; exh. A–22). By the time of pouring such sample the problem of proper size gradation of the aggregate had been solved by use of an additional screening of the aggregate (R4, tab B3; tr. 4/36, 5/94; exh. A–92). Unfortunately, the coloration problem remained unsolved. The aggregate still was largely gray and white. (*Exhs. A–1, –2; exh. G–3*) (emphasis added). Government insisted that the aggregate did not meet the contract specifications (R4, tab B4).

Although only one gravel sample from the subcontractor's place of business was submitted as evidence, Exhibit G–3, another sample of gravel also had been drawn by the government and testimony on both samples was heard by the board. From the testimony as to source, the other sample was drawn by Roy Childers, a materials technician for the government, from another stockpile at the subcontractor's place of business, rather than the stockpile actually used. However, both parties mistakenly refer to Roy Childers' sample as Exhibit G–3, Appellant's brief, p. 28, Appellee's brief, p. 11 n. 6. The stockpile from which G–3 was drawn was not made clear by the record.

The board also heard testimony concerning four photographs of the subcontractor's actual stockpile of aggregate for the Wright–Patterson Hospital contract. The government's and Blount Bros.' witnesses disagreed on whether the photos accurately depicted the color of the stockpile. The board made no explicit determination.

Finally, evidence was presented about efforts made by Blount to locate proper gravel and about locations suggested by the government where it asserted Blount could

find gravel that would comply with contract color. The board concluded that Blount Bros. had not established impossibility because a source of aggregate that met all of the contract needs existed in Blount Bros.' "back yard," Montgomery, Alabama. Finding of Fact No. 14. Blount challenges the testimony that supported this conclusion as being so incomplete and nonspecific as to be insufficient as a matter of law.

## OPINION

Blount Bros. brings this appeal pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 607 (g) (1982). While we may freely review the board's conclusions of law, under the Act our review of the board's findings of fact is limited to a determination whether those findings are arbitrary, capricious, based on less than substantial evidence, or rendered in bad faith. 41 U.S.C. § 609(b) (1982). *American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 1112 (Fed.Cir.1985). In this appeal, we are concerned solely with whether the board's findings are supported by substantial evidence. "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).' (Citations omitted.)" *United States v. General Electric Corp.,* 727 F.2d 1567, 1572 (Fed.Cir.1984).

Even though there may be adequate evidence to support alternative findings of fact, "the one chosen by the Board is binding on this court regardless of how we might have decided this issue upon a de novo review." *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984). If there is conflicting testimony in the record, "the Board's preference will, generally, not be disturbed unless we can conclude that the findings are not supported by some evidence which qualitatively and, in appropriate circumstances, quantitatively, can be deemed substantial evidence when the record is viewed as a whole." *Koppers Co., Inc. v. United*

*States,* 405 F.2d 554, 558, 186 Ct.Cl. 142 (1968).

## I.

The contract specified in Provision 6.2.2 "tan and brown washed river gravel." Nothing in the contract specified that the overall visual impression of the concrete panels had to be a specific color or that a physical majority of the stones had to be tan or brown. As the board pointed out, "Blount promised in the contract to perform in strict accordance with the terms of the contract specifications. As such the government was entitled to obtain concrete made with tan and brown aggregate." App. 0000008-09. The contract did not call for bush hammered panelling that had a predominant visual impression of tan and brown, but for coarse aggregate that was tan and brown washed river gravel.

Only one of the two pieces of physical evidence that the board used to support its Findings of Fact Nos. 9 and 12 actually does support its conclusion that Blount Bros. failed to supply the correct color of coarse aggregate. Exhibit A-1, the photograph of the concrete panel that the board reviewed, was irrelevant because the contract specified only the color of the aggregate prior to mixing materials to make the concrete. Exhibit G-3, the sample of gravel from the subcontractor's place of business, remains the crucial piece of physical evidence that the washed river gravel supplied was not tan and brown. If authentic, this sample constitutes substantial evidence supporting the board's finding that the gravel was not tan and brown.

Blount Bros. objects to the representativeness of Exhibit G-3 because it mistakenly believes that the sample drawn by Roy Childers from a different pile was Exhibit G-3. Appellant's brief, p. 28. However, according to testimony on App. 14180, Childers' sample was not the one received by the board as Exhibit G-3. Therefore, Blount Bros.' objection, whatever its merit, is simply irrelevant. Moreover, Blount Bros.' failure to object * as to the source of

---

* During oral argument, Blount Bros. maintained that it had objected to the chain of custody for

the actual Exhibit G–3 leaves us without a ground to consider whether Exhibit G–3 lacked representativeness as a sample.

■ By focusing its arguments before this court on the phrase "washed river gravel," Blount Bros. is trying to shift the dispute away from the contracted color of the aggregate to its origin. Although Blount Bros. asserts that the contract did not specify a color requirement by calling for "tan and brown washed river gravel," as a matter of law, we hold that the origin requirement of the contract phrase cannot be interpreted to nullify the color requirement.

The board heard uncontradicted testimony from Mr. Myron Aukerman, an employee of the subcontractor supplying the aggregate, Ernst Enterprises, that because the washed river gravel in the Ohio River Valley was created through a glacial deposit, all other natural aggregate deposits in the Valley contain similar distributions of tans and browns and other colors as the aggregate that was used in the Wright–Patterson Hospital project. App. 12134.

Furthermore, the board heard testimony from Roy Childers that while he did not take his sample from the main stockpile from which the Wright–Patterson contract was allegedly being completed, but from another stockpile in the back, his reason was that "all the materials in the area are the same whether you got them out of this pile or the next one. Colorwise they're all the same." App. 13219.

An inference of minimal differences in color is further supported by testimony of the subcontractor's vice president. After noting that another government project completed by the subcontractor used the same source of aggregate, when the attorney for the government asked, "I guess what you're saying, no matter what the contract says, brown or tan, gray or what, if we use your material, that's what we're going to get. We're going to get one type of aggregate," he responded, *"Yes,* you're

going to get tans and browns." (Emphasis added.) App. 12174.

The record contains contradictory testimony concerning four photographs of the subcontractor's aggregate. Blount Bros. offered four photographs of the stockpile of aggregate located at the subcontractor's place of business, allegedly set aside to perform the contract, A–4, A–5, A–6, and A–7. The person who took the photographs testified that these pictures fairly and accurately depicted the stockpile's color as it appeared when he took the pictures, App. 11098–99, and that no special instructions on developing were given by him to the developer. *Id.* at 11099. These photographs, which we too have reviewed, show a stockpile of gravel that appears to be a sandy brown color. When, however, Administrative Judge Harper asked Roy Childers if the pictures correctly depicted the stockpile's color, Childers responded negatively and stated that it looked like the photographs had been shaded, perhaps with a lens. App. 13217–18.

Even though the board could have made contrary findings if it looked at only the photographic evidence as opposed to relying on Roy Childers' testimony or looking at Exhibit G–3, the board's conclusion concerning color must stand if it is supported by substantial evidence. That is so even if we might come to a different conclusion under a de novo review. *See Koppers,* 405 F.2d at 559. We hold that the board's decision that the aggregate supplied by the subcontractor for the contract was not tan and brown washed river gravel is supported by substantial evidence.

We have reviewed Blount Bros.' argument about the government's alleged failure to cooperate, and determine that it has no merit.

### II.

■ Blount Bros. also argues that the contract was impossible or commercially

---

Exhibit G–3 and its source. However, it is clear from Blount Bros.' brief that when Blount Bros. objected to the source of Exhibit G–3, it was objecting to the source of Roy Childers' sample which is not Exhibit G–3 according to our understanding of the testimony found in the Appendix on page 14180.

impracticable to perform. "Whether specifications are factually impossible or commercially impracticable to perform is a question of fact, not of law (*Maxwell Dynamometer Co. v. United States*, 386 F.2d 855, 181 Ct.Cl. 607 (1967)) and should be decided by the Board. However, the ultimate issue is one of law; . . . ." *Koppers*, 405 F.2d at 558–59 (Ct.Cl.1968). The board's fact findings concerning impossibility will stand if they are supported by substantial evidence. *Foster Wheeler Corp. v. United States*, 513 F.2d 588, 593–94, 206 Ct.Cl. 533 (1975). We may freely review the final conclusion of whether the contractor's performance is excused. *Id.* at 594. In *Hol–Gar Manufacturing Corp. v. United States*, 360 F.2d 634, 638, 175 Ct.Cl. 518 (1966), the court stated that "[w]hen the Government contracts for supplies to be manufactured in accordance with government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result." It necessarily follows that the government also impliedly warrants that the specifications are possible to meet. *See Ordnance Research, Inc. v. United States*, 609 F.2d 462, 479, 221 Ct.Cl. 641 (1979) ("[S]pecifications having major safety defects are fully as much in breach of the implied warranty as defects in the feasibility, practicability, or commercial possibility of performance as specified.").

In this final issue we are faced with the question of whether Blount Bros.' failure to perform is due to its own inadequacy *or* due to a defective contract specification written by the government. *See Natus Corp. v. United States*, 371 F.2d 450, 178 Ct.Cl. 1 (1967).

The contractor has the burden to prove that it explored and exhausted alternatives before concluding the contract was legally impossible or commercially impracticable to perform. *Jennie–O Foods, Inc. v. United States*, 580 F.2d 400, 409, 217 Ct.Cl. 314 (1978). Here, Blount Bros. must prove that its search for a source of aggregate that would meet the specifications extended as far as "some reasonable limit to the area from which a contractor can be expected to acquire raw materials in performance of a contract." *Mitchell Canneries, Inc. v. United States*, 77 F.Supp. 498, 503–04, 111 Ct.Cl. 228 (1948).

We determine that Blount Bros. cannot carry its burden of proving legal impossibility by relying on the adequacy of its own actions. Although Blount Bros. states that the board failed duly to consider its three-state search of Ohio, Indiana, and Kentucky, Blount Bros. also looked at samples from Alabama and Georgia and offered them to the government as potential sources. Appellant's Brief, pp. 31–32 n. 6; App. 20117–18, 20136–37. It is most unusual for a contractor to argue before this court that Alabama, a location suggested by the government, is too far to go for a source of aggregate when the contractor itself investigated the possibility that Alabama aggregate could fulfill the contract when the dispute over color first arose.

In addition, there was specific testimony in the record concerning whether Montgomery, Alabama, is a reasonable distance to travel for a source of aggregate. A Mr. Smith was asked about his knowledge of "whether or not concrete aggregate suppliers ever transport aggregate from a distance as great as Montgomery, Alabama, to Wright–Patterson Air Force Base," to which he responded:

> Well, that's not uncommon, I would say. Not unheard of, at least. It may not be as common as getting it next door but we're aware that the people in the Montgomery area have shipped—supplied jobs as far away as Minnesota and Southern Florida for that particular color and that particular type of aggregate.

App. 13136.

■ We hold, however, that Blount Bros. has carried its burden of establishing legal impossibility by proving that the contract specifications as written were defective. *See Ordnance Research, Inc.*, 609 F.2d at 479. Even though the board found "the evidence was unrebutted that tan and brown aggregate that would meet all of the contract needs was available in Blount's home town," App. 0000009, the testimony on pages 13135–36 is so general,

incomplete, and vague that it could not be determined that the gravel in Montgomery, Alabama, met *all* the specifications in the contract. For example, there is no basis for concluding that the aggregate met the specifications concerning size or composition. Thus, the testimony clearly does not constitute substantial evidence.

Nor is the specification, for example, on composition, a fanciful issue. After Blount Bros. searched extensively but unsuccessfully for a source of acceptable aggregate, it asked the government to identify a source of gravel that met the color specifications of the contract. The government responded with only one source, located in Mayfield, Kentucky. The board states that the aggregate from this source failed to meet the composition requirement of the contract. Finding of Fact No. 13.

Moreover, the government's inability to locate a sample that would meet its own specifications after Blount Bros.' repeated attempts to find a source further leads us to conclude that Blount Bros.' problem with performance resulted from the government's own specifications. Even though Blount Bros. might have more expertise than the government concerning gravel, since there is no indication in the record that Blount Bros. wrote the specifications, responsibility for the specifications' inherent defect lies with the government. *Foster Wheeler*, 513 F.2d at 601.

We, therefore, reverse and determine that the $87,340.00 adjustment was not justified.

REVERSED.