**EHLERS–NOLL, GMBH, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–707C.

United States Court of Federal Claims.

Dec. 13, 1995.

Reed L. von Maur, Frankfurt, Germany, attorney of record for plaintiff.

Martin F. Hockey, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge:

### INTRODUCTION

This construction contract dispute comes before the court on the parties' cross-motions for summary judgment. Plaintiff, Ehlers–Noll GmbH, filed its complaint in this court on November 18, 1993, alleging that the contracting officer improperly reduced the amount of its payment under a contract between it and the United States Army. Ehlers–Noll, therefore, seeks full payment of the contract price, plus interest, from the defendant, the United States. Both parties now request that the court render summary judgment in this matter because, they contend, there are no genuine issues of material fact and each, therefore, believes that it is entitled to judgment as a matter of law. For the reasons set forth herein, the court finds that there are clearly genuine issues of material

fact which preclude the entry of summary judgment and, therefore, it would be unwise to grant such a motion on this limited and undeveloped record. This is so because an evaluation of the witnesses' credibility is critical to the court's finding of operative facts.

### FACTS

The operative facts of this case, which are taken from the joint stipulations of the parties as well as the affidavits and documents submitted in connection with the cross-motions, are in *large measure* not in dispute. Nevertheless, where a factual dispute does exist, it shall be so noted.

Ehlers–Noll was awarded Contract No. DAJA76–91–C–0068 (*i.e.*, the subject of this dispute) on February 12, 1991, by the U.S. Army Contracting Command Europe. By the terms of the contract, Ehlers–Noll was to repair certain interior stairwells in five buildings at the Neubrucke Family Housing Area, Baumholder Military Community, Baumholder, Germany. The contract was awarded for the fixed price lump sum of DM 954,000.[1]

As part of the stairwell renovations, Ehlers–Noll was required to install 127 basement doors of fire-rated quality. The specifications for these doors provided:

Basement doors rated T 30, assembled of corner case and steel leaf. size approx. 90 × 205 cm [2], shall be built in to the existing openings ... in a workmanlike manner.

The door leaf shall be constructed of double-skinned sheet steel, 1.5 mm in sheet thickness.

The door leaf shall be understood to include 2 roll type hinges with spring band for automatic closing action....

All ferrous parts (the case included) shall be proper cleaning accomplished—coated with alkyd type zincchromate primer paint (U.S. Federal Paint specification # TT–P–645 A). The surfaces involved shall have all imperfections spackled and thereafter

---

1. "DM" is the abbreviation for Deutsche mark, *Webster's II New Riverside University Dictionary* 1346 (1988).

2. Pursuant to another provision of the contract specifications, 25 out of the 127 doors to be installed were to be 110 × 205 cm, rather than 90 × 205 cm, but otherwise exactly the same.

shall be pre-treated using alkyd odorless enamel (U.S. Federal Paint Specifications # TT–E–545 B(1)) and finished, at least twice and well covered, with semigloss interior enamel (U.S. Federal Paint Specifications # TT–E 508 C. type 1) of dark brown color shade, RAL 8014.

\* \* \* \* \* \*

The complete door systems shall be made acc. to DIN 4102 and with "BAM" test mark and certificate.

(Def.App. at 4). "DIN" as used in the contract specifications refers to the "Deutsche Industries Norm" (German Industrial Norms), which are the official criteria set by the German government for standard products. In addition, "BAM" refers to the official German agency responsible for testing and approving building materials. Finally, "T 30" as used in the contract specifications for the doors denotes the fire rating of the door system and reflects a fire resistance of 30 minutes.

The German version of the contract specifications contained the additional term, not in the English version, which provided that the door leaf be 48 mm in total thickness. On the issue of the contract language and translation, a clause of the contract (FAR § 52.000–4034) provided:

> For purposes of the instant contract, the English language version shall govern in all instances.
>
> (a) Specifications ... or any other documents furnished to the Contractor by the Government in connection with performance of the instant contract work, will be in the English Language.

(Def.Supp.App. at 2). Furthermore, the contract incorporated FAR § 52.225–0014, which states:

> In the event of inconsistency between any terms of this contract and any translation thereof into another language, the English language meaning shall control.

(Def.Supp.App. at 3).

During the pre-performance walk-through of the construction site, the contractor, Ehlers–Noll, inquired of the government's designated site inspector, Walter Regel, about the basement doors intended for installation under the contract specifications. Plaintiff alleges that the site inspector directed Norbert Noll, part owner and employee of the plaintiff company, to examine the doors that had been installed at the Wetzel Housing Complex, as the government intended that the same doors be installed pursuant to the contract at issue here. Plaintiff relies on the affidavits of its employees, Mr. Noll and Norbert Kollosche, who was also present at the walk-through, in support of its factual position. Defendant disputes this position, pointing to the affidavit of Mr. Regel, the Army's site inspector. Therein, Mr. Regel denies that he directed Ehlers–Noll to install the same doors as had been installed elsewhere or that he ever directed or agreed to a substitute product.

At any rate, Mr. Noll did in fact visit the Wetzel Housing Complex and identified the doors that had been installed there as Hormann H8–1 non-galvanized steel basement doors, a standard product of the Firm Hormann. Thereafter, Ehlers–Noll delivered 127 H8–1 doors to the job site on June 3, 1991, and the parties again disagree about what occurred at that time. Ehlers–Noll's foreman at the Neubrucke Family Housing Area (i.e., the job site), Peter Medler, contends by affidavit that, upon the delivery of the doors to the job site, Mr. Regel approved them as being the doors called for in the contract specifications. Again, Mr. Regel denies in his affidavit that he ever confirmed that the doors delivered to the job site were the correct ones or that he ever accepted them as such. In addition, he contends that he did not have the authority to do so.

Eventually, the Hormann H8–1 doors were installed by Ehlers–Noll. On June 21, 1991, the contracting officer, Pia Smith, was notified by the contracting officer's representative, Eberhard Blug, that Ehlers–Noll had installed doors that did not conform to the contract specifications. Specifically, the doors installed had a steel sheet thickness of .88 mm, while the contract specifications called for doors with a steel sheet thickness of 1.5 mm. Ehlers–Noll was also notified of this by Mr. Blug on the same day.

At a meeting on August 13, 1991, the contracting officer, Ms. Smith, met with Ehlers–Noll's representative, Mr. Noll, to discuss this issue. Mr. Noll contended that the doors installed by plaintiff did meet the specifications because the twin steel sheets *together* had a combined thickness in excess of the required 1.5 mm (*i.e.*, .88 mm + .88 mm = 1.76 mm). The contracting officer rejected this interpretation. Later, Ms. Smith discovered that the doors installed by Ehlers–Noll also were not "assembled of corner case" as required by the contract. Therefore, she concluded, based on these two defects, that the doors installed by Ehlers–Noll did not conform to the requirements of the contract specifications.

After receiving the contractor's final invoice, dated March 16, 1992, the contracting officer notified Ehlers–Noll of the government's decision to conditionally accept the H8–1 doors, but would reduce the final payment in order to reflect the lost monetary value to the government occasioned by the installation of *nonconforming doors*. In a letter dated May 6, 1992, the contracting officer further informed plaintiff that she had conducted a market survey and determined that the difference in value between the contractually-specified door and the door actually installed equalled DM 394 per basement door. This same letter notified Ehlers–Noll that the government would withhold DM 40,-386 (or DM 318 per door)[3] from the final payment. On November 17, 1992, the contracting officer[4] issued a final decision deducting DM 40,386 from the contractor's final invoice under the contract.

## CONTENTIONS OF THE PARTIES

1. *Defendant's Motion for Summary Judgment*

The United States was the initial party to move for summary judgment. In its motion filed June 13, 1994, defendant simply contends that plaintiff failed to install doors that complied with all of the obligatory contract specifications and that the contracting officer's reduction in the contract price was, therefore, appropriate and correct. The government further observes that the doors installed by the contractor were *not* 1.5 mm in steel sheet thickness and were not assembled of corner case, both of which were required under the contract. Furthermore, defendant argues that the reduction in the contract price was clearly authorized by the terms of the contract, which gave the contracting officer the unbridled authority "in the public interest ... to accept the work with an appropriate adjustment in the contract." (Def.App. at 9).

2. *Plaintiff's Opposition and Cross–Motion*

In response, Ehlers–Noll avers that the contract specifications were defective in that no door was available on the German market that could meet the "spec" requirements of the contract. Plaintiff charges that, as a consequence, defendant has breached its implied warranty of the specifications. Moreover, plaintiff alleges that the government, through Mr. Regel, authorized a change in the contract specifications, permitting the H8–1 doors to be installed. In connection with its argument that no door could meet the specifications, Ehlers–Noll contends that the contract required a door leaf with a *total* thickness of 48 mm, as per the German version of the contract. Additionally, plaintiff maintains that the detailed painting instructions contained in the contract necessitated the use of a *non*-galvanized door only. This is so, avers plaintiff, because galvanized steel requires a special primer paint, which was not the primer specifically called for in the specifications. Lastly, Ehlers–Noll asserts that, in view of the specifications calling for doors manufactured according to DIN 4102 and with "BAM" test mark and certificate, the contract necessitated the installation of a

---

3. There is some dispute in the record as to why the reduction in the contract price per door was DM 318, rather than the DM 394 figure arrived at by the contracting officer. The contracting officer, Pia Smith, states that she offered to reduce the contract price by DM 318 in the interest of arriving at a speedy and amicable resolution of this matter.

4. The contracting officer who issued the final decision regarding plaintiff's claim was not the same individual, *i.e.*, Pia Smith, who had previously acted as contracting officer. The November 17, 1992 final decision was issued by contracting officer Rogelio Ramirez.

manufacturer's commercially-available standard model or "standard product." (Pl.Reply Br. at 12).

Next, having concluded that no door was commercially available which fully satisfied the contract specifications (*i.e.*, non-galvanized, 48 mm thick double-skinned steel door with T 30 fire rating), Ehlers–Noll argues that the door that it installed, the H8–1, meets all of the salient characteristics called for in the contract specifications and is, therefore, equal to the door that was specified in the contract. Plaintiff maintains that the Hormann H8–1 door is non-galvanized, less than 48 mm thick (*i.e.*, 45 mm thick), made of double-skinned steel, with a T 30 fire rating, according to DIN 4102, with a "BAM" test mark and certificate. By contrast, contends plaintiff, the door identified by the government as best meeting the contract specifications, while it does have a steel sheet thickness of 1.5 mm, is galvanized and is 54 mm thick. Therefore, Ehlers–Noll concludes that the door that it did in fact install best meets the specifications and is reasonable in the face of the government's defective specifications.

### 3. *Defendant's Opposition and Reply*

In opposition to plaintiff's position, the United States avers that the contract specifications were not defective. In this regard, defendant alleges that the contract did not require doors with an overall thickness of 48 mm because the English language version controls and did not contain this requirement. Furthermore, the government maintains that the contract also did not require the installation of a non-galvanized door. Second, defendant alleges that its employees did not modify the contract, and that Mr. Regel did not possess the requisite authority to modify the specifications or to accept nonconforming doors. Finally, defendant contends that the Hormann H8–1 doors installed by plaintiff failed to meet the salient characteristics of the contract specifications because they were not constructed using 1.5 mm thick steel sheets. Moreover, the government argues that Ehlers–Noll was not entitled to deviate from the specifications and provide what it deemed to be an equivalent

product, but, rather, was required to strictly comply with all of the contract specifications.

### 4. *Plaintiff's Reply*

In its reply brief, plaintiff essentially reiterates the position advanced in its earlier brief. In sum, Ehlers–Noll contends that the contract specifications were defective because no door was commercially available that met the specifications, that the government has failed to identify a door that meets the contract specifications, and that plaintiff explored and exhausted all reasonable sources for the supply of the required doors. In addition, and as a consequence thereof, plaintiff now argues that the contract should be deemed constructively changed, as a result of the defective specifications, to allow equivalent doors (*i.e.*, those installed by Ehlers–Noll) to be substituted. For these reasons, Ehlers–Noll concludes that it is entitled to judgment as a matter of law.

### DISCUSSION

### 1. *Summary Judgment Standards*

 Preliminarily, we note that summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. RCFC 56. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, pursuant to RCFC 56, the court must view the evidence in the light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden may be discharged by "pointing out ... that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1563 (Fed.Cir.1987). If the movant succeeds in carrying its burden, then the burden falls

on the non-movant to demonstrate, by appropriate evidence, the existence of a genuine issue of material fact. *Beauchamp Constr. Co., Inc. v. United States,* 14 Cl.Ct. 430, 435 (1988). Finally, it is worth observing, at this time, that "a [trial] court in passing on a Rule 56 motion performs what amounts to what may be called a negative discretionary function. The court has no discretion to *grant* a motion for summary judgment, but even if the court is convinced that the moving party is entitled to such a judgment the exercise of sound judicial discretion may dictate that the motion should be denied, and the case fully developed." *McLain v. Meier,* 612 F.2d 349, 356 (8th Cir.1979). With the foregoing considerations firmly in mind, we now turn to address the substance of the case at bar.

### 2. *Analysis*

#### a. *Introduction*

■ On this record, the undisputed facts establish that the doors installed by plaintiff (Hormann H8–1) failed to fully conform to the contract specifications. Plaintiff does not dispute that the Hormann H8–1 doors were not 1.5 mm in sheet thickness, apparently abandoning its earlier position before the contracting officer. Nor does plaintiff deny that the H8–1 doors were not "assembled of corner case" as required by the uncontroverted specifications. Rather, Ehlers–Noll charges that the specifications as written were impossible or commercially impracticable to perform because no door was available on the German market that fully met all of the contract requirements. As a consequence, plaintiff maintains that the contract specifications were defective and that, therefore, plaintiff is entitled to the recovery of the amount withheld from the full contract price.

■ It is a well-established precept of government contract law that the government warrants the design specifications that it contractually promulgates. *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1007 (Fed.Cir. 1989); *Hol–Gar Mfg. Corp. v. United States;* 360 F.2d 634, 638, 175 Ct.Cl. 518 (1966); *Big Chief Drilling Co. v. United States,* 26 Cl.Ct.

1276, 1293 (1992). As was stated by the U.S. Supreme Court in *Spearin,* 248 U.S. at 136, 39 S.Ct. at 61, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." More recently, the Court of Claims interpreted this principle, holding that "[w]hen the Government contracts for supplies to be manufactured in accordance with government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result." *Hol–Gar Mfg.,* 360 F.2d at 638. In general, then, "design specifications created by the government contain an implied warranty that if the contractor adheres to the specifications, the result will be acceptable to the government." *T.L. Roof & Assoc. Constr. Co. v. United States,* 28 Fed.Cl. 572, 578 (1993).

■ From this general premise, the Federal Circuit has held that "[i]t necessarily follows that the government also impliedly warrants that the specifications are possible to meet." *Blount Bros.,* 872 F.2d at 1007. Therefore, if the specifications are impossible or commercially impracticable to meet, then the specifications are defective, and the government has breached its implied warranty of the specifications. "[W]hether specifications are factually impossible or commercially impracticable to perform is a question of fact, not of law." *Id.* (quoting *Maxwell Dynamometer Corp. v. United States,* 386 F.2d 855, 181 Ct.Cl. 607 (1967)). Accordingly, if there are no genuine issues concerning the central facts establishing impossibility or commercial impracticability, then plaintiff is entitled to summary judgment as "the government bears the financial risk for the consequences of any defects in the plans and specifications." *T.L. Roof,* 28 Fed.Cl. at 578. *See also Big Chief Drilling,* 26 Cl.Ct. at 1293. First, however, the court must interpret the contract specifications as a matter of law before it can proceed to determine whether there are any genuine issues of material fact with respect to plaintiff's contention that the specifications were defective under the doctrines of impossibility and commercial impracticability.

### b. *The Contract Specifications*

We begin by observing that the parties are in agreement with respect to the requirements of many, and even most, of the contract specifications. There appears to be no dispute, on this record, that the contract unequivocally required the installation of doors—

(1) that had a T 30 fire rating;

(2) that were assembled of corner case;

(3) that were assembled of steel leaf;

(4) that were 90 × 205 cm (or 110 × 205 cm for some of the doors) in size;

(5) that were constructed of double-skinned sheet steel of 1.5 mm sheet thickness;

(6) that included two (2) roll type hinges with spring band;

(7) that were manufactured according to DIN 4102; and

(8) that had the "BAM" test mark and certificate.

### c. *Additional "Specs" Averred By Plaintiff*

Ehlers–Noll argues, nevertheless, that the contract specifications contained, either explicitly or implicitly, at least three additional requirements—(i) that, based on the German version of the specifications, the doors be 48 mm in total thickness; (ii) that, by virtue of the painting specifications, the doors be made of *non*-galvanized steel; and (iii) that, in view of testing and certification requirements, the doors be a commercially available "standard product" of a manufacturer.[5] We now address, therefore, each of these *contended* requirements to determine if they are literally or implicitly contained in the contract specifications.

#### i. *48 mm Total Thickness*

First, we are constrained by the clear and unambiguous language of the contract to hold that the specifications do *not* include the requirement that the doors be 48 mm in total thickness. It is true, of course, that the German translation provided with the con-

tract specifications did include an additional phrase requiring that the doors be 48 mm in total thickness. However, the contract expressly dictated that "the English language version *shall* govern in all instances." (Jt.Stip. ¶ 15 (emphasis added)). It is undisputed that the English version did not literally contain the 48 mm thickness requirement. Because this version, by express provision, governs, the contract specifications do not, and cannot be interpreted to, include a requirement that the doors installed be 48 mm in total thickness.

This conclusion is further supported by a second clause of the contract which provides: "In the event of any *inconsistency* between any terms of this contract and any translation thereof into another language, the English language meaning *shall* control." (Jt.Stip. ¶ 16 (emphasis added)). Ehlers–Noll asserts that this clause only applies when there is a *contradiction* between two versions of the contract (*i.e.,* when a provision in one version contradicts a provision of the other). We do not think that the word "inconsistency" can be read so narrowly. In its general usage, "inconsistency" means "not consistent." *Webster's II New Riverside University Dictionary* 620 (1988). The mere presence of an additional term in the German translation, not present in the English version, makes that version *not consistent* with the English version. Moreover, even if the two versions were consistent (*i.e.,* not inconsistent), the contract unambiguously provides that the English language version governs. Accordingly, based upon the plain terms of the contract, we hold as a matter of law that the contract specifications do not contain a requirement that the doors be 48 mm in total thickness.

#### ii. *Non–Galvanized Doors*

Second, because the contract specifications contain detailed and mandatory painting instructions that are inconsistent with the use of *galvanized* steel doors, we must conclude, as a matter of law, that the specifications *sub silentio* include a requirement that doors made of *non*-galvanized steel shall be install-

---

**5.** In its Reply Brief, plaintiff argues that: "[t]he requirement that the doors have the German 'BAM' test mark and certification and the T–30

fire rating was *substantially the same as* requiring a standard product." (Pl.Reply Br. at 12 (emphasis added)).

ed under the contract. At bar, it is uncontroverted that the contract specifications required that the door be "coated with alkyd type zincchromate primer (U.S. Federal Paint specification # TT–P 645 A)." (Jt.Stip. ¶ 19). The parties agree that this primer provides rust protection and have also stipulated that—

As an alternative to rust protection with a coat of alkyd type zincchromate primer paint, ferrous metal can be galvanized for protection from rust. Galvanized metal does not require a coat of alkyd type zincchromate primer paint to provide rust protection.

(Jt.Stip. ¶ 20).

The government maintains that the contract specifications did not preclude the contractor from utilizing galvanized doors in order to achieve a rust-protected final result, thus obviating the necessity of the door being "coated with alkyd type zincchromate primer." However, we observe that the contract did not set out alternative performance criteria (*i.e.*, of obtaining rust protection) and then leave the contractor free to choose among various alternatives to reach that goal. Rather, the contract specifications themselves expressly direct the contractor as to how to achieve rust-protected doors (*i.e.*, through the application of a coat of alkyd type zincchromate primer paint). In fact, the stipulations of the parties establish that the installation of *galvanized* doors would be inconsistent with the application of this expressed primer paint provision. Defendant's proposed interpretation, therefore, would completely ignore the unambiguous language of the contract, which states: "All ferrous parts *shall be* ... coated with" the specified primer paint. (Def.App. at 4 (emphasis added)).

Furthermore, the joint stipulations of operative facts provide that—

Galvanized metal cannot be painted unless it is treated with a special primer coat which enables paint to adhere to the galvanizing. The alkyd type primer paint specified in the Contract ... is not the special primer enabling paint to adhere to galvanized metal.

(Jt.Stip. ¶ 21). Thus, the installation of galvanized doors, per the government's interpretation, would require the use of a different primer than the one that was explicitly required in the contract specifications, down to the exact U.S. Federal Paint Specification number. This court will not endorse a reading of the contract that would permit a complete disregard of the express, mandatory painting instructions dictated by the government's own specifications.

Moreover, our conclusion is buttressed by *other* provisions of the contract that expressly provide on occasion for the use of galvanized, rather than non-galvanized, metal. For instance, elsewhere in the contract, the contractor is required to install "[m]aterials being made of hot-dip galvanized steel" and "a galvanized steel pipe handrail." (Jt.Stip. ¶¶ 22–23). Thus, it is clear that, by the terms of the contract, the government selected the type of rust protection that it wanted in each individual instance. In some cases, the contract required galvanization, while, in others, the contract specified zincchromate primer paint. The government selected the method of rust protection, and a galvanized door would not have conformed to the mandatory contract specifications. Therefore, based on the mandatory and explicit painting instructions, and construing the contract as a whole in the light most favorable to the nonmovant, we hold, on the undisputed contract language, that the contract specifications required that a *non*-galvanized door be installed.

### iii. *Commercially–Available Product*

Finally, we hold, and defendant apparently does not dispute, that the contract specifications contemplated the procurement of a door that was a commercially-available product of a manufacturer. However, the court does not hold, as plaintiff contends, that the contract mandated a commercially-available *standard* product. The court observes, as an initial matter, that the parties agree that the specifications called for a door manufactured in accordance with DIN 4102 and with a T 30 fire rating and the "BAM" test mark and certificate. These requirements obviously embody the parties' contemplation that a commercially-available door would be install-

ed pursuant to the contract. While Mr. Noll maintains, in one of his affidavits, that only a *standard* product with the proper test mark, certification, etc. in place could reasonably be installed within the 130–day time period, we cannot find this requirement in the plain language of the contract *specifications,* as a matter of law. This type of factual issue may, however, be relevant to the issue of impossibility or commercial impracticability, addressed below. Based on this undisputed record, we are compelled to hold that the contract specifications contemplated the procurement and installation of a commercially-available door by Ehlers–Noll. Accordingly, nothing on the face of the contract mandates that the door installed be a "standard" product.

### iv. *Summary of the Specifications*

In sum, we find that, as a matter of law, on this undisputed record, the plain and unambiguous language of the contract specifications calls for a door meeting the following requirements:

(1) T 30 fire rating;

(2) assembled of corner case;

(3) assembled of steel leaf;

(4) 90 × 205 cm (or 110 × 205 cm for some of the doors) in size;

(5) constructed of double-skinned sheet steel of 1.5 mm sheet thickness;

(6) including two (2) roll type hinges with spring band;

(7) manufactured according to DIN 4102;

(8) with "BAM" test mark and certificate.

Additionally, we hold, as a matter of law, that the contract dictated *sub silentio,* and by necessary implication, that the doors installed meet *two* additional requirements as follows:

(1) that they be constructed of non-galvanized steel; and

(2) that they be commercially available as a product of a manufacturer.

Because the facts underlying the foregoing determination are *not* in dispute, it follows that there are no genuine issues of material fact concerning the basic contract specifications. Therefore, as a matter of law, we interpret the contract as encompassing the minimum operative requirements set out above.

### d. *Genuine Issues of Material Fact*

Having delineated the operative contract specifications, the court is now in a position to evaluate the record to determine—whether there are any genuine issues of material fact with respect to the central and dispositive issues in this case, *i.e.,* were the contract specifications either impossible or commercially impracticable to perform? Because we find that a genuine issue of material fact is present on this record, the court is constrained to deny the cross-motions for summary judgment.

The instant case is strikingly similar to *Blount Brothers, supra.* In that case, plaintiff contracted to do some construction work at an Air Force hospital. A provision of the contract specified that the concrete to be used in performing the work be composed of tan and brown washed river gravel of a certain size. The government there (as here at bar) adjusted the contract price downward because the contractor failed to use that specified tan and brown washed river gravel. On appeal from the Board of Contract Appeals, the contractor argued that the contract specifications for the concrete were impossible or commercially impracticable to perform.

The Federal Circuit held, on these facts, that "the contract specifications as written were defective." *Id.,* 872 F.2d at 1007. In reaching this conclusion, the court was persuaded by "the government's inability to locate a sample that would meet its own specifications." *Id.* at 1008. Because the government could not point to a sample that would meet the specifications, and in view of the contractor's failed attempts to find a source for the specified gravel, the court found that any deficiency in the contractor's performance was the result of the government's own specifications. *Id.* Accordingly, the Federal Circuit held that the government must bear the responsibility for the defective specifications and could not, therefore, assess a downward adjustment in the contract price against the contractor.

At bar, of course, Ehlers–Noll argues that the contract specifications were impossible or commercially impracticable to perform because no door was available on the German market that fully conformed to the contract requirements. Specifically, no door was both 1.5 mm in steel sheet thickness and constructed of non-galvanized steel. As the Federal Circuit stated in *Blount Brothers,* in order to establish impossibility or commercial impracticability, "[t]he contractor has the burden to prove that it explored and exhausted alternatives before [deviating from the specifications]." *Id.* In his affidavits, Norbert Noll declares that he determined that no door was commercially available that met the complete specifications based upon a review of the catalogs of Germany's two dominant door manufacturers. Viewing this evidence in the light most favorable to the plaintiff, as we must do when evaluating defendant's motion for summary judgment, plaintiff has certainly succeeded in creating a genuine issue of material fact by introducing evidence that suggests that the contract specifications were impossible to perform. Accordingly, defendant is not entitled to summary judgment. As we previously observed, "whether specifications are factually impossible or commercially impracticable to perform is a question of fact." *Maxwell Dynamometer Corp., supra.*

On the other hand, when the evidence is viewed in the light most favorable to the defendant, pursuant to our consideration of plaintiff's cross-motion for summary judgment, there is also a genuine issue of material fact concerning the sufficiency and/or adequacy of the steps taken by plaintiff to reasonably exhaust the alternatives to fully comply with all of the contract specifications. While Mr. Noll has stated that he consulted the product lines of two door manufacturers, a genuine issue of material fact continues to exist as to—whether this was reasonably sufficient in light of the business custom in the German contracting industry and the overall totality of the circumstances. For example, it may have been possible for one of the two dominant manufacturers to modify one of their standard products, for instance by not galvanizing a door that normally receives galvanization. Furthermore, Mr. Noll believes that only the two major door manufacturers could make doors meeting the specifications. However, apparently he did not inquire of any other door manufacturers or consult their catalogs to confirm this belief. A genuine issue of material fact, therefore, exists concerning the reasonableness *and* sufficiency of these actions in light of the trade custom as well as whether any other door manufacturer could meet the specifications. Accordingly, we hold, as a matter of law, that plaintiff is likewise not entitled to summary judgment on this record.

### 3. *Additional Considerations*

■ Moreover, even if there were no genuine issues of material facts present on this limited and undeveloped record, the court is firmly convinced that to grant summary judgment at this juncture would clearly be imprudent. In this connection, "courts have some latitude to *deny* summary judgment even when there is technically" no dispute as to any material fact, which is not the case here at bar. *First Interstate Bank v. United States,* 27 Fed.Cl. 348, 353 (1992) (emphasis added).

At bar, the parties have submitted affidavits which plainly and categorically contradict each other regarding material facts. As was explicated earlier, Ehlers–Noll's employees, Messrs. Noll and Kollosche, both assert that the Government site inspector, Walter Regel, directed them to install the same doors as had been installed on the Wetzel Housing Complex project. Mr. Regel, in his affidavit, of course, emphatically denies this allegation. Furthermore, Ehlers–Noll's foreman, Peter Medler, stated in his affidavit that Mr. Regel approved the doors that were installed upon their delivery to the job site. Again, Mr. Regel warmly denies that this approval occurred. Clearly then, *all* of these disparate statements cannot possibly be true. To make a long story short, the court can euphemistically state that it is left with an abiding conviction that someone is *less than forthcoming.*

Much of the *relevant* factual evidence before this court consists of the statements of various witnesses proffered by the parties. As such, those witnesses' credibility is neces-

sarily critical to a fair and reasonable resolution of the merits of this case. If one or more of the witnesses is indeed being less than truthful with the court, the testimony on other points, even if uncontested, becomes suspect. As in *First Interstate Bank*, "the credibility of the witnesses is crucial to this case. For this reason, ... summary disposition is inappropriate." *Id.* at 354 (citing *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510). Against this background, "[t]he court should have the freedom to allow the case to continue when it has any doubt as to the wisdom of terminating the action prior to a full trial." *Id.* at 353 (quoting 10A C. Wright, A. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2728 at 187–88 (1983)). This is such a case. Thus, on this record as a whole, it would be unwise, and extremely injudicious, for the court to decide the merits of this matter solely on the cold, bland, and hospitable papers before it. Such a resolution would foreclose the opportunity for the court to form operative impressions about the credibility of the fact witnesses that can only be made at trial.

## CONCLUSION

Therefore, in light of all of the foregoing, we hold that there are several genuine issues of material fact present on this record which preclude the entry of summary judgment for *either* party. In addition, the court is convinced that to grant summary judgment at this juncture and on this record would be unwise in view of the criticality of the witnesses' credibility in this matter. Accordingly, the parties' cross-motions for summary judgment are hereby DENIED.